**UNITED STATES of America, Plaintiff,**

v.

**Douglas STEPNEY, et al., Defendants.**

**No. CR 01–0344 MHP.**

United States District Court, N.D. California.

Feb. 11, 2003.

George L. Bevan, Jr., U.S. Attorney's Office, San Francisco, CA, for Plaintiff.

Steven Kalar, Daniel Blank, Federal Public Defender's Office, San Francisco, CA, Joseph D. O'Sullivan, Joseph D. O'Sullivan Law Offices, San Francisco, CA, for Defendants.

## MEMORANDUM AND ORDER

### re Joint Defense Agreements

PATEL, Chief Judge.

Defendants have been charged with conspiracy and numerous violations of federal drug and weapons laws. In a previous order, this court required that all joint defense agreements be put into writing and submitted to the court. Counsel for

defendants submitted proposed joint defense agreements for *in camera* review. Having reviewed the proposed joint defense agreements and having heard arguments from defendants on this matter, and for the reasons stated below, the court issues the following order.

*BACKGROUND*

Defendants are charged with participation in the criminal enterprises of a street gang in the Hunter's Point area of San Francisco. In a series of three indictments, the government has charged a total of nearly thirty defendants with over seventy substantive counts relating to the operation of the gang over a period of several years. The number of defendants and the separate crimes charged render this case extraordinarily factually complex. Defense counsel report that they have already received discovery of over 20,000 pages of police reports, FBI memos, and other law enforcement materials.

In an effort to prepare coherent defenses efficiently, various defense counsel have sought to enter into joint defense agreements that would allow defendants to share factual investigations and legal work product. Out of concern for the Sixth Amendment rights of the defendants and the integrity of the proceedings, at the parties' initial appearance on October 15, 2001, the court ordered that any joint defense agreements be committed to writing and provided to the court for *in camera* review. Oct. 15, 2001 Reporter's Transcript at 11:11–19. No joint defense agreements were ever filed with the court pursuant to this order.

More than a year after the court's initial order, the attorney for one defendant moved to withdraw his representation on the grounds that he had entered into a joint defense agreement with another defendant who he had since come to believe was cooperating with the prosecution. Although the attorney seeking to withdraw did not believe that he had obtained confidential information from the cooperating defendant, he did believe that the joint defense agreement had created an implied attorney-client relationship that included a duty of loyalty. The attorney maintained that this duty of loyalty would prevent him from cross-examining the cooperating defendant, should he testify at trial.

The court denied the motion to withdraw after conducting a colloquy in which the cooperating defendant waived any attorney-client privilege with respect to information received by the moving attorney. The court also ruled that joint defense agreements do not create in one attorney a duty of loyalty toward the defendant with whom he collaborates. In an order dated November 22, 2002, the court set forth requirements that future joint defense agreements: (1) be in writing; (2) contain a full description of the extent of the privilege shared; (3) contain workable withdrawal provisions; and (4) be signed not only by the attorneys but also by the clients who hold the privileges at issue. Order re Motion To Withdraw, Nov. 22, 2002, at 2.

At the following status conference, the court ordered that a proposed joint defense agreement be submitted to the court for *in camera* review. Defense counsel submitted two proposed agreements, which the court discussed with defense attorneys at an *in camera* status conference on January 13, 2003.[1] One proposed agreement, entitled "Joint Defense Agreement Extending Attorney-

---

1. While all defense counsel participated in discussions on joint defense agreements at the court's request, nothing in this memorandum should be taken as a representation as to which defendants wish to enter a single joint defense agreement at the present time.

Client Privileges" (hereinafter "Joint Defense Agreement"), discusses the duties of confidentiality and loyalty each attorney who signs the agreement will owe to each client who signs. The other, entitled "Joint Defense Agreement re Work Product" (hereinafter "Work Product Agreement"), addresses the confidential sharing of legal research and discovery analysis among the lawyers for the various defendants.

## DISCUSSION

### I. The Joint Defense Privilege Generally

The joint defense privilege is commonly described as an extension of the attorney-client privilege. See, e.g., In re Santa Fe Intern. Corp., 272 F.3d 705, 719 (5th Cir. 2001); United States v. Evans, 113 F.3d 1457, 1467 (7th Cir.1997); United States v. Aramony, 88 F.3d 1369, 1392 (4th Cir. 1996), cert. denied, 520 U.S. 1239, 117 S.Ct. 1842, 137 L.Ed.2d 1046 (1997). United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir.1989); Waller v. Financial Corp. of Am., 828 F.2d 579, 583 n. 7 (9th Cir.1987). Scholarly commentators have uniformly argued that the joint defense privilege differs sufficiently from the attorney-client privilege in both purpose and scope that the two should be viewed as entirely separate doctrines. See, e.g., Deborah Stavile Bartel, Reconceptualizing the Joint Defense Doctrine, 65 Fordham L.Rev. 871 (1996); Craig S. Lerner, Conspirators' Privilege and Innocents' Refuge: A New Approach to Joint Defense Agreements, 77 Notre Dame L.Rev. 1449 (2002); Susan K. Rushing, Note: Separating the Joint–Defense Doctrine From the Attorney–Client Privilege, 68 Tex. L.Rev. 1273 (1990). To inform the analysis of the proposed joint defense agreements, the court must first examine in detail the nature of the joint defense privilege.

### 1. Protections for Attorney–Client Communications

"The attorney-client privilege is an evidentiary rule designed to prevent the forced disclosure in a judicial proceeding of certain confidential communications between a client and a lawyer." United States v. Rogers, 751 F.2d 1074, 1077 (9th Cir.1985), quoted in Wharton v. Calderon, 127 F.3d 1201, 1205 (9th Cir.1997). The purpose of the privilege is to encourage "full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); see also Hunt v. Blackburn, 128 U.S. 464, 470, 9 S.Ct. 125, 32 L.Ed. 488 (1888) (grounding the privilege "in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure").

■■■ The attorney-client privilege limits only the power of a court to compel disclosure of attorney-client communications or otherwise admit the communications themselves into evidence. Outside the courtroom, the privilege does not provide grounds for sanctioning an attorney's voluntary disclosure of confidential communications to third parties. Wharton, 127 F.3d at 1205–06 (attorney-client privilege could not provide grounds to bar respondents from informally communicating with petitioner's former attorneys). This is not to say that attorneys may freely reveal their clients' confidences should they so desire. Mechanisms other than the attorney-client privilege protect against voluntary disclosure of confidential communications by counsel. The ethical

rules governing attorneys require that all information pertaining to a client's case be kept confidential. Cal. Bus. & Prof.Code § 6068(e) (setting forth attorney's duty "[t]o maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client"); Model Rules of Prof'l Conduct, R. 1.6 (3d ed.1999). The comment to Model Rule of 1.6 discusses the relationship between the attorney-client privilege and the ethical duty of confidentiality:

> The principle of confidentiality is given effect in two related bodies of law, the attorney-client privilege (which includes the work product doctrine) in the law of evidence and the rule of confidentiality established in professional ethics. The attorney-client privilege applies in judicial and other proceedings in which a lawyer may be called as a witness or otherwise required to produce evidence concerning a client. The rule of client-lawyer confidentiality applies in situations other than those where evidence is sought from the lawyer through compulsion of law. The confidentiality rule applies not merely to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source.

*Id.,* R. 1.6 cmt. The ethical duty of confidentiality may be enforced by more than just sanctions against an offending attorney. In a criminal case, where an attorney violates this ethical duty by revealing a client's confidences to the government, a court may suppress the resulting evidence. *Rogers,* 751 F.2d at 1078–79. Prosecutors may also be subject to sanctions where they have induced an attorney to violate her duty of confidentiality. Model Rules of Prof'l Conduct, R. 8.4(a).

 In criminal cases, the Constitution also protects confidential attorney-client communications from the eyes and ears of the government. An intrusion by the government into an attorney-client relationship in order to obtain confidential information may be deemed a violation of a defendant's Sixth Amendment right to effective assistance of counsel or Fifth Amendment due process rights. *See, e.g., United States v. Haynes,* 216 F.3d 789, 796 (9th Cir.2000), *cert. denied,* 531 U.S. 1078, 121 S.Ct. 776, 148 L.Ed.2d 674 (2001) (deliberate intrusion into attorney-client relationship may violate Fifth Amendment); *United States v. Aulicino,* 44 F.3d 1102, 1117 (2d Cir.1995) (unintentional interference with attorney-client relationship may violate defendant's Sixth Amendment rights where government gains confidential information and prejudice results). In such a situation, a court may suppress evidence gathered as a result of the communication or, in egregious cases where the prejudice cannot otherwise be cured, dismiss the indictment. *Haynes,* 216 F.3d at 796; *United States v. Marshank,* 777 F.Supp. 1507, 1521–22 (N.D.Cal.1991).

These three doctrines—the evidentiary rule of attorney-client privilege, the ethical duty of confidentiality imposed on attorneys, and the ethical and constitutional requirements that the government not intrude upon the attorney-client relationship—serve the common end of keeping communications between attorney and client from disclosure either to adversaries or the finder of fact, thus encouraging the full and frank communications between attorney and client that are required for the adversarial system to function.

### 2. *The Evolution of the Joint Defense Privilege*

 The joint defense privilege initially arose as an extension of the attorney-client privilege against court-ordered disclosure against confidential communications. Ordinarily, the attorney-client privi-

lege will be deemed waived where a client discloses the contents of an otherwise privileged communication to a third party or where the communication occurs in the presence of third parties. *United States v. Gann*, 732 F.2d 714, 723 (9th Cir.), *cert. denied*, 469 U.S. 1034, 105 S.Ct. 505, 83 L.Ed.2d 397 (1984) (privilege waived when communication made in presence of third party); *Weil v. Investment/Indicators, Research and Management, Inc.*, 647 F.2d 18, 24 (9th Cir.1981) (subsequent disclosure of content of communication waives privilege). The joint defense privilege was adopted as an exception to this waiver rule, under which communications between a client and his own lawyer remain protected by the attorney-client privilege when disclosed to co-defendants or their counsel for purposes of a common defense. *Hunydee v. United States*, 355 F.2d 183, 185 (9th Cir.1965); *Continental Oil Co. v. United States*, 330 F.2d 347, 350 (9th Cir. 1964); *Chahoon v. Virginia*, 62 Va. 822 (1871); *see also Waller*, 828 F.2d at 583 n. 7.

Although established as an evidentiary rule which bound courts from compelling disclosure of certain evidence, the joint defense privilege was soon applied as an ethical doctrine which imposed on counsel a limited duty of confidentiality toward their client's co-defendants regarding information obtained in furtherance of a common defense.[2] In particular, courts have ruled that an attorney may be disqualified if her client's interests require that she cross-examine (or oppose in a subsequent action) another member of a joint defense agreement about whom she

has learned confidential information. *See generally*, Arnold Rochvarg, Joint Defense Agreements and Disqualification of Co-Defendant's Counsel, 22 Am. J. Trial Advoc. 311 (1998); Bartel, *supra.*

In the first case to raise the issue, *Wilson P. Abraham Constr. Corp. v. Armco Steel Corp.*, 559 F.2d 250, 253 (5th Cir. 1977), the Fifth Circuit addressed a motion to disqualify plaintiff's counsel brought by defendants in a civil antitrust action. In a prior criminal action against various steel mills for price fixing in which Armco had been charged, plaintiff's attorney had represented another steel company also named as a defendant. In this capacity, he had conferred with representatives of other indicted companies, including Armco, at meetings designed to develop a joint defense. In its motion, Armco maintained that the attorney's obligation to maintain the confidences learned through the previous joint defense effort conflicted with his client's present interests and warranted his disqualification. The Fifth circuit agreed, finding:

> Just as an attorney would not be allowed to proceed against his former client in a cause of action substantially related to the matters in which he previously represented that client, an attorney should also not be allowed to proceed against a co-defendant of a former client wherein the subject matter of the present controversy is substantially related to the matters in which the attorney was previously involved, and wherein confidential exchanges of information

2. Although courts have declared that attorneys operating under a joint defense agreement owe defendants other than their clients a limited duty of confidentiality, the ABA Committee on Ethics & Professional Responsibility has opined that the Model Rules of Professional Conduct do not impose such

duties on an attorney. ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 395 (1995). The Committee nonetheless noted that courts had recognized an attorney's "fiduciary obligation" to other members of a joint defense agreement that could create a disqualifying conflict of interest. *Id.*

took place between the various co-defendants in preparation of a joint defense. *Id.* at 253.

Despite the analogy to attorney-client relationships, the *Abraham Construction* court did not treat the attorney's participation in a joint defense agreement as identical to formal representation of a client. Had plaintiff's attorney actually represented Armco, he would have been disqualified automatically on the irrebuttable presumption that he had gained confidences during the prior representation on a related matter. *In re Yarn Processing Patent Validity Litigation*, 530 F.2d 83, 89 (5th Cir.1976); *accord Trone v. Smith*, 621 F.2d 994, 998 (9th Cir.1980); *Elan Transdermal Ltd. v. Cygnus Therapeutic Sys.*, 809 F.Supp. 1383, 1388 (N.D.Cal.1992). Finding that there had been "no direct attorney-client relationship," the court refused to presume that plaintiff's attorney had obtained confidential information in the course of the joint defense. The court instead placed the burden on the party moving for disqualification to prove that the plaintiff's attorney had actually been privy to confidential information. *Abraham Constr.*, 559 F.2d at 253.

■ Subsequent courts have followed suit in requiring a showing that the attorney actually obtained confidences before disqualifying counsel. *See, e.g., Fred Weber, Inc. v. Shell Oil Co.*, 566 F.2d 602, 608, 610 (8th Cir.1977), *cert. denied*, 436 U.S. 905, 98 S.Ct. 2235, 56 L.Ed.2d 403 (1978), *overruled on other grounds by In re Multi–Piece Rim Products Liability Litigation*, 612 F.2d 377, 378 (8th Cir.1980); *Essex Chemical Corp. v. Hartford Accident & Indemnity Co.*, 993 F.Supp. 241, 251–52 (D.N.J.1998); *GTE North, Inc. v. Apache Products Co.*, 914 F.Supp. 1575, 1580 (N.D.Ill.1996); *see generally* Rochvarg, *supra.* While a joint defense agreement does impose a duty of confidentiality, that

duty is limited in that the showing required to establish a conflict of interest arising from prior participation in a joint defense agreement is significantly higher than that required to make out a conflict based on former representation of a client.

Finally, a few courts have assumed that the prosecution in a criminal case could violate a defendant's constitutional rights by receiving information from cooperating co-defendants (or their attorneys) that was obtained through a joint defense agreement. *See Aulicino*, 44 F.3d at 1117 (attendance at joint defense meeting of defendant in negotiations to cooperate with government does not require hearing on Sixth Amendment violation without showing that cooperating defendant had provided privileged information); *United States v. Hsia*, 81 F.Supp.2d. 7, 16–20 (D.D.C. 2000) (even knowing intrusion into the attorney-client relationship during plea negotiation with co-defendant's attorney does not constitute violation without showing that communications actually passed to government).

## II. *The Court's Power to Inquire into Joint Defense Agreements*

■ As a threshold matter, defendants object to the court's inquiries into joint defense agreements prior to any controversy arising that would require such disclosure. Defendants assert that there is no authority for requiring advance disclosure of joint defense agreements and that such disclosures inhibit their ability to represent their clients effectively. Defendants also object to the court's requirement that the joint defense agreements be committed to writing. The court therefore begins by addressing how its inherent supervisory powers permit inquiry into the circumstances of representation and imposition of procedural requirements on joint defense agreements in order to safeguard

defendants' Sixth Amendment rights to conflict-free counsel.

■ "Under their supervisory power, courts have substantial authority to oversee their own affairs to ensure that justice is done." *United States v. Simpson*, 927 F.2d 1088, 1089 (9th Cir.1991). A court may exercise its supervisory powers to implement a remedy for the violation of a recognized statutory or constitutional right, or may take preemptive steps to avoid such violations by imposing procedural rules not specifically required by the Constitution or Congress. *United States v. Hasting*, 461 U.S. 499, 505, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983); *Simpson*, 927 F.2d at 1090.

■ These supervisory powers unquestionably allow courts to require disclosure of the precise nature of a criminal defendant's representation to ensure that no conflict of interest exists that would deprive a defendant of his Sixth Amendment right to effective assistance of counsel. Courts have routinely intervened—prior to any controversy arising—where the circumstances of a criminal defendant's representation raises the potential for conflict of interest during the course of the proceedings, even before intervention is required by statutory or constitutional rule. *See Bucuvalas v. United States*, 98 F.3d 652, 655 (1st Cir.1996) (exercising supervisory power to require that federal district courts inquire into representation of multiple defendants by a single attorney); *Henderson v. Smith*, 903 F.2d 534, 537 (8th Cir.) (grounding requirements on inquiry into multiple representation in supervisory powers), *cert. denied*, 498 U.S. 989, 111 S.Ct. 529, 112 L.Ed.2d 539 (1990); *Ford v. United States*, 379 F.2d 123, 125–26 (D.C.Cir.1967) (same).

Indeed, the Supreme Court has recently considered under what circumstances the Sixth Amendment *requires* a trial court to inquire into potential conflicts that are brought to its attention. *See Mickens v. Taylor*, 535 U.S. 162, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002) (addressing whether state trial court had duty to inquire into potential conflict of interest arising from representation of defendant accused of killing attorney's client). The Supreme Court has long held that in cases of joint representation of multiple defendants by a single attorney, where a trial court knows or should know about a particular conflict of interest, that court has a constitutional duty to explore the conflict further and to ensure that defendant's Sixth Amendment rights have been adequately protected or knowingly waived. *See Cuyler v. Sullivan*, 446 U.S. 335, 344–47, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Congress has seen fit to exceed the constitutional minimum and mandate exploration of potential conflicts by federal trial courts in every instance of multiple representation. Fed.R.Crim.P. 44(c)(2). These decisions by the Court and Congress to require inquiry under certain circumstances presuppose that trial courts possess the power to investigate such potential conflicts in the first place.

As discussed above, joint defense agreements impose an ethical duty of confidentiality on participating attorneys, presenting the potential for conflicts of interest that might lead to the withdrawal or disqualification of a defense attorney late in the proceedings or the reversal of conviction on appeal. *See, e.g., United States v. Henke*, 222 F.3d 633, 643 (9th Cir.2000) (reversing defendants' convictions where trial court improperly denied defense counsel's motion to withdraw on the eve of trial). When a party to a joint defense agreement decides to cooperate with the government, the potential for disclosure of confidential information also threatens other defendants' Sixth Amendment rights. *See Aulicino, supra; Hsia, supra.*

"Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States,* 486 U.S. 153, 160, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). Courts also "[have] an independent interest in protecting a fairly-rendered verdict from trial tactics that may be designed to generate issues on appeal." *United States v. Moscony,* 927 F.2d 742 (3d Cir.), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2812, 115 L.Ed.2d 984 (1991). Given the high potential for mischief, courts are well justified in inquiring into joint defense agreements before problems arise.

The present case appears particularly likely to lead to conflicts caused by cooperation between defendants. Here, there are a large number of defendants, some of whom may not have known each other prior to their first appearance before this court. The charges span a variety of incidents over several distinct periods of time and allege roles of varying degrees of culpability. The interests of any two defendants are less likely to coincide precisely than in the case of two defendants accused of essentially equal participation in a single crime.[3] Where defendants do not have cohesive interests, the potential for conflict is, by definition, greater—as is the potential for cooperating with the government.

In addition to the lack of cohesion obvious from the face of the indictment, the unfolding of the present proceedings has provided further evidence that the defendants' interests are not generally united. A significant number of the defendants in this case have in fact entered guilty pleas and cooperated with the government. One of the cooperating defendants has been murdered and another has received threats. Whether or not these actions can be attributed to any defendants in this case, they have proven intimidating to other defendants seeking to plead guilty or cooperate with the government. These circumstances illustrate that defendants interests are not cohesive, indicating a far greater likelihood of conflict than in a case with fewer defendants and a more unified defense.

 The threat that these agreements might pose to defendants' Sixth Amendment rights—and to the integrity of the proceedings—warrants the minimal disclosures that the court has thus far required and the restrictions imposed by this court. The court appreciates defendants' concern that disclosing who among them have signed a joint defense agreement might give the government insight into the trial strategies of various defendants. Defendants have not, however, asserted any legal grounds to prevent disclosure of joint defense agreements to the court. To the extent that joint defense agreements simply set forth the existence of attorney-client relationships—implied or otherwise—between various attorneys and defendants, the contents of such agreements do not fall within the attorney-client privilege. *United States v. Bauer,* 132 F.3d 504, 508–09 (9th Cir.1997) (attorney-client privilege does not cover the identity of an attorney's client); *see also Hsia,* 81 F.Supp.2d at 11 n. 3 (expressing doubt that "either the existence or the terms of a [joint defense agreement] are privileged"). The court has nonetheless conducted its inquiry into joint defense agreements *in camera* in order to avoid offering the prosecution any hint of defense strategies.

Once disclosed to the court, a joint defense agreement may indicate a potential

---

**3.** This difference of interests between defendants is, in fact, likely to lead to the choice of separate representation with a joint defense agreement rather than joint representation.

for future conflicts of interest that warrants further action. The present case certainly calls for inquiry.[4] As set forth below, the proposed joint defense agreement has heightened the court's concern that potential conflicts might arise in this particular case, or that the defendants have been substantially misinformed of their rights under the joint defense privilege. The court now turns to these areas of concern.

### III. *Problems with the Proposed Joint Defense Agreements*

The proposed Joint Defense Agreement submitted by counsel contemplates "open and candid exchange of investigation leads and legal theories of defense." The agreement suggests that any defendant who is a party to the case will "meet to discuss the case and . . . candidly and openly address all charges and possible defenses." It provides in unqualified terms that "all counsel who sign this agreement will owe all defendants who sign this agreement a duty of confidentiality." It also provides that each attorney will owe each defendant a duty of loyalty. The agreement notes that individuals may withdraw from the agreement by notifying all remaining members, but that withdrawal does not relieve a party of the duties created by the agreement.

The proposed agreement submitted by defendants is problematic in at least two material respects. First, the proposed agreement purports to create a duty of loyalty on the part of signing attorneys that extends to all signing defendants. The proposed defense agreement also does not contain workable withdrawal provisions that adequately avoid the possibility of disqualification on the eve of trial, or even during trial.

### A. *Ethical Obligations Imposed by the Privilege*

■ The proposed joint defense agreement explicitly imposes on signing attorneys not only a duty of confidentiality, but a separate general duty of loyalty to all signing defendants. Such a duty has no foundation in law and, if recognized, would offer little chance of a trial unmarred by conflict of interest and disqualification.

■ Joint defense agreements are not contracts which create whatever rights the signatories chose, but are written notice of defendants' invocation of privileges set forth in common law.[5] Joint defense

4. The joint defense agreements presented to this court may even create the type of representation on which the court must act under Federal Rule of Criminal Procedure 44(c). Rule 44(c)(2) requires that a federal court take active measures to safeguard defendants' Sixth Amendment rights when defendants jointly charged in a criminal indictment "are represented by the same counsel." Fed. R.Crim.P. 44(c)(1)(B), (2). While each of the jointly charged defendants in the present case has his or her own separate attorney, the proposed joint defense agreement presented to this court purports to impose on *each* attorney duties of loyalty and confidentiality toward *each* defendant. As discussed below, the court finds little to distinguish this form of representation from multiple representation of all defendants who sign the agreement by a single team composed of all the attorneys—a situation in which this court would be obliged by statute to "take appropriate measures to protect each defendant's right to counsel" unless there is good cause to believe that no conflict of interest is likely to arise. Fed. R.Crim.P. 44(c)(2).

5. No written agreement is generally required to invoke the joint defense privilege. The existence of a writing does establish that defendants are collaborating, thus guarding against a possible finding that a particular communication was made spontaneously rather than pursuant to a joint defense effort. *See United States v. Weissman*, 195 F.3d 96, 98–99 (2d Cir.1999) (finding no joint defense agreement in place at the time communication took place). A written joint defense agreement also protects against misunder-

agreements therefore cannot extend greater protections than the legal privileges on which they rest. A joint defense agreement which purports to do so does not accurately set forth the protections which would be given to defendants who sign. In the present case, unless the joint defense privilege recognized in this Circuit imposes a duty of loyalty on attorneys who are parties to a joint defense agreement, the duty of loyalty set forth in the proposed agreement would have no effect other than misinforming defendants of the actual scope of their rights.

 Courts have consistently viewed the obligations created by joint defense agreements as distinct from those created by actual attorney-client relationships.[6] *Abraham Constr.*, 559 F.2d at 253; *see also Weber*, 566 F.2d at 607–10; *GTE North*, 914 F.Supp. at 1580. As discussed above, courts have also consistently ruled that where an attorney represents a client whose interests diverge from a party with whom the attorney has previously partici-

pated in a joint defense agreement, no conflict of interest arises unless the attorney actually obtained relevant confidential information. This position is inconsistent with a general duty of loyalty owed to former clients, which would automatically preclude an attorney from subsequently representing a client with an adverse interest. Model Rules of Prof'l Conduct, R. 1.9.

To support the proposed imposition of a general duty of loyalty, defendants rely exclusively on the Ninth Circuit's opinion in *United States v. Henke*, 222 F.3d 633 (9th Cir.2000) (per curiam), which states that a joint defense agreement "establishes an implied attorney-client relationship with the co-defendant," *id.* at 637. Defendants' argument rests on the conclusion that by referring to an "implied attorney-client relationship," the Ninth Circuit implicitly expanded the joint defense privilege beyond the recognized protection against disclosure of confidential informa-

standings and varying accounts of what was agreed to by the attorneys and their clients.

6. Several courts have drawn parallels between joint defense agreements and the attorney-client relationship in passing prefatory remarks, rather than as legal conclusions drawn after thorough analysis of the scope of each relationship and the precise nature of the ethical duties involved. Bartel, *supra*, at 901. These statements should not be taken out of context, but must be examined in light of the issues decided by the particular court. Individual courts have recognized that the two types of relationships create privileges which are similar in some respects and different in others. The *Abraham Construction* court, for example, stated that in a joint defense arrangement, "the counsel of each defendant is, in effect, the counsel of all for the purposes of invoking the attorney-client privilege in order to shield mutually shared confidences." *Abraham Constr.*, 559 F.2d at 253. In the following paragraph, however, the court distinguished between the two types of relationships in holding that for parties to a

joint defense agreement, "there is no presumption that confidential information was exchanged as there was no direct attorney-client relationship." *Id.*

In particular, an analogy between joint defense agreements and attorney-client relationships in the context of the evidentiary attorney-client privilege does not necessarily hold where the ethical obligations imposed by joint defense agreements are at issue. The Seventh Circuit, in upholding the district court's exclusion of a defendant's statements to a co-defendant's legal investigator pursuant to the attorney-client privilege, made the sweeping statement, "The attorney who thus undertakes to serve his client's co-defendant for a limited purpose becomes the co-defendant's attorney for that purpose." *United States v. McPartlin*, 595 F.2d 1321, 1337 (7th Cir.), *cert. denied*, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979). In light of the narrow evidentiary issue before that court, the court does not read *McPartlin* to pass on whether joint defense relationships entail the full ethical obligations of the attorney-client relationship.

tion learned through a joint defense agreement to impose on each attorney an additional general duty of loyalty to her client's co-defendants. Defendants have cited no legal authority suggesting that joint defense agreements entail a duty of loyalty.

In *Henke,* three co-defendants participated in joint defense meetings in which confidential information was discussed. *Id.* On the eve of trial, one defendant pleaded guilty and agreed to testify for the government. Counsel for the other two defendants each moved to withdraw on the grounds that the duty of confidentiality prevented them from cross-examining the former co-defendant and impeaching him with prior statements made in confidence. *Id.* The cooperating co-defendant filed papers expressly stating that he did not waive the attorney-client privilege and would take legal action if the remaining defense counsel disclosed confidential information, even in an *ex parte* motion to withdraw. *Id.* at 638.

The conflict addressed by the *Henke* court resulted from the attorney's duty to protect specific confidential information revealed during the course of a joint defense meeting, not from a broader duty of loyalty owed to the cooperating witness. Although the *Henke* court referred to joint defense agreements in terms of an "implied attorney-client relationship," the court's analysis focused exclusively on confidential information. Accepting that the cooperating witness had made statements at joint defense meetings which would contradict his testimony, the court noted that the remaining defense attorneys could neither introduce those statements nor seek out further evidence to support those statements without using the witness's confidences against him. *Id.* at 637–38. In finding a conflict, the court did not rest on the attorneys' adverse position to the

former party to the joint defense agreement, but relied instead on the fact that the defense attorneys would use or divulge specific pieces of privileged information.

Admittedly, there is a significant difference between the disclosure of confidential information and the use of confidential information without disclosure. Both the common law doctrine of attorney-client privilege and the ethical duty of confidentiality address only the disclosure of confidential information and not the use of confidential information, without disclosure, in a manner adverse to the client's interests. *See* 8 Wigmore, Evidence § 2292 (attorney-client privilege); Model Rules of Prof'l Conduct, R. 1.6 (duty of confidentiality). Any obligation on the part of an attorney not to use confidential information against a client arises from separate duties. *See* ABA Model Rules of Prof'l Conduct, R. 1.9(c) ("A lawyer who has formerly represented a client in a matter ... shall not thereafter (1) use information relating to the representation to the disadvantage of the client ...."). An attorney might use information gained in confidence to structure an investigation for facts with which she could discredit the cooperating witness without ever disclosing the information and running afoul of either the attorney-client privilege or the duty of confidentiality.

■ The *Henke* court suggests that the duty to protect confidential information divulged under a joint defense agreement may extend beyond the duty not to disclose and include a duty not to use the information gained in a manner adverse to the interests of the client. *See, e.g. Henke,* 222 F.3d at 637–38 ("Had [the attorneys] pursued the material discrepancy in some other way, a discrepancy they learned about in confidence, they could have been charged with using it against their one-

time client . . . .").[7] This position is entirely consistent with the rule for disqualification established in *Abraham Construction* and followed by other courts: disqualification is proper where a party seeking disqualification can show that an attorney for another defendant actually obtained relevant confidential information through a joint defense agreement. Indeed, the *Henke* court unambiguously adopted the standard set forth in *Abraham Construction* by quoting that decision at length. *See Henke*, 222 F.3d at 637 (quoting *Abraham Constr.*, 559 F.2d at 253).

■ For the *Henke* court, a conflict of interest only arose where the attorney possessed relevant confidential information. Even the possession of some confidential information by an attorney would not require disqualification unless the defense of her client required disclosure or use of that information:

> There may be cases in which defense counsel's possession of information about a former co-defendant/government witness learned through joint defense meetings will not impair defense counsel's ability to represent the defendant

or breach the duty of confidentiality to the former co-defendant. Here, however, counsel told the district court that this was not a situation where they could avoid reliance on the privileged information and still fully uphold their ethical duty to represent their clients.

*Henke*, 222 F.3d at 638.

In distinguishing cases based on reliance on protected information, the *Henke* court specifically noted that joint defense meetings in and of themselves are not disqualifying. *Id.* at 638. This refusal to extend a *per se* rule would not be possible if a general duty of loyalty existed to a cooperating former co-defendant, because the interests of the testifying witness in cooperating effectively would always be adverse to the interests of· the remaining defendants in preventing or minimizing the witness's testimony.

Finally, the court notes that the cases on which the *Henke* court relied to reach its conclusion do not suggest a general duty of loyalty or a full attorney-client relationship between an attorney and all co-defendants

---

7. Defendants also assert in the joint defense agreement that any duty of confidentiality includes a duty of loyalty, relying on the Ninth Circuit's pronouncement in *Damron v. Herzog* that "it is anomalous to find that the duty of confidentiality does not have as its direct correlation a duty of loyalty." 67 F.3d 211, 215 (9th Cir.1995), *cert. denied,* 516 U.S. 1117, 116 S.Ct. 922, 133 L.Ed.2d 851 (1996) (citations omitted). Defendants apparently read this language to imply that whenever an attorney is under a duty of confidentiality to an individual, she is also under a general duty of loyalty.

When the above language is placed in context, however, it is clear that the *Damron* court referred to a far more limited duty. The court simply echoed the rule embraced by *Henke* and *Abraham Construction* that the law does not trust an attorney who actually possesses relevant confidences to proceed without using or disclosing them:

Damron argues that Herzog's advice to the Wheatleys necessarily involved decisions based on confidential information, which inevitably created the risk of a breach.

We agree that when an attorney engages in a conflict of interest on the same matter, he or she is in a position to act on the confidential information learned from the relationship with the first client, whether or not that information is actually disclosed or acted upon in advising the new client. Because this position creates such a grave risk of breach of confidence, it is anomalous to find that the duty of confidentiality does not have as its direct correlation a duty of loyalty.

*Damron,* 67 F.3d at 215 (citations omitted). Because the correlative "duty of loyalty" referred by the *Damron* court would not arise unless the attorney actually possessed confidential information, it is distinct from the general duty of loyalty owed former clients.

who are party to a joint defense agreement. *See Abraham Const.,* 559 F.2d at 253 (finding that in the context of a common defense, "there is no presumption that confidential information was exchanged as there was no direct attorney-client relationship. [The attorney] should not be disqualified unless the trial court should determine that [he] was actually privy to confidential information."). These cases address only whether the protections for confidential information are waived when the information is shared with co-defendants or their counsel who are parties to a joint defense arrangement. *See Waller v. Financial Corp. of America,* 828 F.2d 579, 583 n. 7 (9th Cir.1987) (describing the joint defense privilege as "an extension of the attorney-client privilege" under which "communications by a client to his own lawyer remain privileged when the lawyer subsequently shares them with co-defendants for purpose of a common defense"); *United States v. McPartlin,* 595 F.2d 1321, 1326 (7th Cir.) (finding that statements of a former co-defendant remain protected by attorney-client privilege because waiver of the privilege is not inferred from the disclosure in confidence to a co-party's attorney for a common purpose), *cert. denied,* 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979); *Abraham Constr.,* 559 F.2d at 253 (finding that in a joint defense arrangement, "the counsel of each defendant is, in effect, the counsel of all for the purposes of invoking the attorney-client privilege in order to shield mutually shared confidences"). The court finds no cases recognizing joint defense agreements as creating either a true attorney-client relationship or a general duty of loyalty.

There is good reason for the law to refrain from imposing on attorneys a duty of loyalty to their clients' co-defendants. A duty of loyalty between parties to a joint defense agreement would create a mine-field of potential conflicts. Should any defendant that signed the agreement decide to cooperate with the government and testify in the prosecution's case-in-chief, an attorney for a non-cooperating defendant would be put in the position of cross-examining a witness to whom she owed a duty of loyalty on behalf of her own client, to whom she also would owe a duty of loyalty. This would create a conflict of interest which would require withdrawal. *See Moscony,* 927 F.2d at 750 ("Conflicts of interest arise whenever an attorney's loyalties are divided, and an attorney who cross-examines former clients inherently encounters divided loyalties.") (citations omitted). Thus, the existence of a duty of loyalty would require that the attorneys for *all* noncooperating defendants withdraw from the case in the event that any *one* participating defendant decided to testify for the government.

A duty of loyalty would even require withdrawal where a defendant sought to put on a defense that in any way conflicted with the defenses of the other defendants participating in a joint defense agreement. An attorney with a duty of loyalty to defendants other than her client could not shift blame to other defendants or introduce any evidence which undercut their defenses. Nor could an attorney cross-examine a defendant who testified on his own behalf.

As these scenarios illustrate, a joint defense agreement that imposes a duty of loyalty to all members of the joint defense agreement eliminates the utility of employing separate counsel for each defendant and (for purposes of conflict analysis) effectively creates a situation in which all signing defendants are represented jointly by a team of all signing attorneys. The court certainly could not permit joint representation of defendants with such dis-

jointed interests as those in the present case. Fed.R.Crim.P. 44(c)(2).

Disqualification of attorneys late in the proceedings benefits no one—it deprives defendants of counsel whom they know and trust and perhaps even chose; it forces delays while new counsel become acquainted with the case, which harm defendants, the prosecution, and the court. In the present case, where certain attorneys have acted as lead counsel for large groups of defendants on major issues, disqualification could prejudice all defendants, not simply those who are parties to the joint defense agreement. The potential for disqualification arising from joint defense agreements can be "used as a weapon in the hands of aggressive prosecutors" that discourages formation of the agreements. Bartel, *supra*, at 872–73; *see also Anderson*, *supra* (addressing prosecutor's motion to disqualify based on defense attorney's participation in joint defense agreement with cooperating witness). To avoid these problems, many defense attorneys draft joint defense agreements that explicitly disclaim any attempt to create an attorney-client relationship. Lerner, *supra*, at 1507–08 & n. 246; Joint Defense Agreement, Am. Law Institute–Am. Bar Ass'n, Trial Evidence in the Federal Courts: Problems and Solutions, at 35 (1999) (providing that the agreement should not be read "to create an attorney-client relationship between any attorney and anyone other than the client of that attorney").

Because neither precedent nor sound policy supports imposing on attorneys who sign a joint defense agreement a general duty of loyalty to all participating defendants, the court finds the provisions of the proposed Joint Defense Agreement that purport to create a duty of loyalty unacceptable. Should defendants wish to enter into representation in which attorneys owe multiple defendants a general duty of loyalty, they would need to obtain approval of the court pursuant to Federal Rule of Criminal Procedure 44(c)(2).[8]

### B. *Withdrawal Provisions*

The proposed joint defense agreement provides that any member may withdraw from the agreement by giving notice to all other members. At the hearing on the proposed agreements, defense counsel suggested that signing defendants were willing accept the risk of conflict created by a withdrawing defendant by accepting the risk that counsel might be disqualified. Ordinarily, defendants seeking to enter into representation which holds potential conflicts of interest accept risks by waiving their rights to assert the conflict, rather than by steeling themselves to assert it as defense counsel suggests.[9] The situation created by the joint defense agreement is no exception.

A first question arising as to the nature of an appropriate waiver is at what point in the proceedings defendants should waive their rights in order to avoid conflicts. Given the highly divergent interests of defendants in the present case, the court is entitled to require that waiver provisions be included in the joint defense agreement, so that defendants who partici-

---

8. In light of the court's findings on the present defendants' lack of cohesive interests, the court would not allow joint representation without compelling evidence indicating that no conflict of interest is likely to arise. Fed. R.Crim.P. 44(c)(2).

9. Defendants are presumably also willing to accept the risk that confidences shared through the joint defense agreement but divulged to the prosecution will lead to the exclusion of resulting evidence or the dismissal of the indictment. The court fails to find much magnanimity in this sort of concession.

pate are fully apprised of the potential for conflict and understand the consequences both of entering into the joint defense agreement and of withdrawing from it. The alternative—deferring action on waiver until one defendant decides to testify—fails to avoid the danger of disqualification entirely.

A second and more complicated question is what sort of waiver provisions would avoid the threat of conflict while adequately protecting defendants' right to cooperate on a joint defense. Defendants could conceivably waive potential conflicts through provisions in the joint defense agreement in one of two ways. One court has allowed defendants to waive potential conflict by agreeing in advance that no attorney will use any information obtained by reason of the confidentiality in cross-examining defendants. *United States v. Anderson,* 790 F.Supp. 231, 232 (W.D.Wash.1992). This method of waiving conflict, however, stands in tension with the general principle that where an attorney has actually obtained confidential information relevant to her representation of a client, the law presumes that she cannot avoid relying on the information—however indirectly or unintentionally—in forming legal advice and trial strategy. *See Henke,* 222 F.3d at 637–38 ("Had [the attorneys] pursued the material discrepancy in some other way, a discrepancy they learned about in confidence, they could have been charged with using it against their one-time client ....."). Because the cross-examining attorney still holds relevant confidences of the witness, it is not clear that she can truly operate free from conflict. The solution also compromises one defendant's right to a fully zealous attorney for another defendant's decision to testify. The waiver is less informed, as each defendant must waive the right to use the others' confidences before knowing what those confidences are.

The better form of waiver is suggested by the American Law Institute–American Bar Association in their model joint defense agreement, which provides:

> Nothing contained herein shall be deemed to create an attorney-client relationship between any attorney and anyone other than the client of that attorney and the fact that any attorney has entered this Agreement shall not be used as a basis for seeking to disqualify any counsel from representing any other party in this or any other proceeding; and no attorney who has entered into this Agreement shall be disqualified from examining or cross-examining any client who testifies at any proceeding, whether under a grant of immunity or otherwise, because of such attorney's participation in this Agreement; and the signatories and their clients further agree that a signatory attorney examining or cross-examining any client who testifies at any proceeding, whether under a grant of immunity or otherwise, may use any Defense Material or other information contributed by such client during the joint defense; and it is herein represented that each undersigned counsel to this Agreement has specifically advised his or her respective client of this clause and that such client has agreed to its provisions.

Joint Defense Agreement, Am. Law Institute–Am. Bar Ass'n, Trial Evidence in the Federal Courts: Problems and Solutions, at 35 (1999). Under this regime, all defendants have waived any duty of confidentiality for purposes of cross-examining testifying defendants, and generally an attorney can cross-examine using any and all materials, free from any conflicts of interest. This form of waiver also places the loss of the benefits of the joint defense agreement only on the defendant who makes the choice to testify. Defendants who testify

for the government under a grant of immunity lose nothing by this waiver. Those that testify on their own behalf have already made the decision to waive their Fifth Amendment right against self-incrimination and to admit evidence through their cross-examination that would otherwise be inadmissible.

The conditional waiver of confidentiality also provides notice to defendants that their confidences may be used in cross-examination, so that each defendant can choose with suitable caution what to reveal to the joint defense group. Although a limitation on confidentiality between a defendant and his own attorney would pose a severe threat to the true attorney-client relationship, making each defendant somewhat more guarded about the disclosures he makes to the joint defense effort does not significantly intrude on the function of joint defense agreements. The attorney-client privilege protects "full and frank" communication because the attorney serves as the client's liaison to the legal system. Without a skilled attorney, fully apprised of her client's situation, our adversarial system could not function. Any secret a client keeps from his own counsel compromises his counsel's ability to represent him effectively and undermines the purpose of the attorney-client privilege.

 Joint defense agreements, however, serve a different purpose. Each defendant entering a joint defense agreement already has a representative, fully and confidentially informed of the client's situation. The joint defense privilege allows defendants to share information so as to avoid unnecessarily inconsistent defenses that undermine the credibility of the defense as a whole. *Bartel, supra,* at 873, 881. In criminal cases where discovery is limited, such collaboration is necessary to assure a fair trial in the face of the prosecution's informational advantage gained through the power to gather evidence by searches and seizures. Co-defendants may eliminate inconsistent defenses without the same degree of disclosure that would be required for an attorney to adequately represent her client. The legitimate value of joint defense agreements will not be significantly diminished by including a limited waiver of confidentiality by testifying defendants for purposes of cross-examination only.

## CONCLUSION

For the foregoing reasons, the Court rules as follows:

(1) Any joint defense agreement entered into by defendants must be committed to writing, signed by defendants and their attorneys, and submitted *in camera* to the court for review prior to going into effect.

(2) Each joint defense agreement submitted must explicitly state that it does not create an attorney-client relationship between an attorney and any defendant other than the client of that attorney. No joint defense agreement may purport to create a duty of loyalty.

(3) Each joint defense agreement must contain provisions conditionally waiving confidentiality by providing that a signatory attorney cross-examining any defendant who testifies at any proceeding, whether under a grant of immunity or otherwise, may use any material or other information contributed by such client during the joint defense.

(4) Each joint defense agreement must explicitly allow withdrawal upon notice to the other defendants.

IT IS SO ORDERED.