**UNITED STATES of America,**

v.

**Alexander SALVAGNO, Raul Salvagno, and AAR Contractor, Inc., Defendants.**

**No. 5:02–CR–51 (HGM).**

United States District Court, N.D. New York.

Feb. 19, 2004.

Hon. Glenn T. Suddaby, United States Attorney, Northern District of New York, Syracuse, NY, Craig A. Benedict, Assistant United States Attorney, of Counsel, for United States.

David Bernfeld, Law Offices of David B. Bernfeld, New York City, for Alexander Salvagno and AAR Contractor, Inc.

Emil M. Rossi, Syracuse, NY, for Raul Salvagno.

## MEMORANDUM—DECISION AND ORDER

MUNSON, Senior District Judge.

The government has charged defendants Alexander Salvagno, and Raul Salvagno, as well as their company, AAR Contractor, Inc., ("AAR") with various crimes stemming from their asbestos abatement business. Count One of the fourteen count Second Superceding Indictment ("Indictment") charges defendants with thirty-three acts of racketeering in violation of 18 U.S.C. § 1962(d). Specifically, Count One sets forth a pattern of racketeering activity consisting of: (1) obstruction of justice, in violation of 18 U.S.C. § 1512(b)(2)(B) (racketeering act one); (2) obstruction of justice, in violation of 18 U.S.C. §§ 1512(b)(1) and (b)(3) (racketeering act two); (3) money laundering, in violation of

18 U.S.C. § 1956(a)(1)(B)(i) and 18 U.S.C. § 2 (racketeering acts three through nine); (4) money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and 18 U.S.C. § 2 (racketeering acts ten through fourteen); and, (5) money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and 18 U.S.C. § 2 (racketeering acts fifteen through thirty-three). Count Two charges defendants with conspiring to violate the Clean Air Act, ("CAA"), 42 U.S.C. §§ 7401 et seq., and the Toxic Substances Control Act, ("TSCA"), 15 U.S.C. §§ 2601 et seq. Counts Three through Eleven charge defendants with violating the CAA, 42 U.S.C. § 7413(c)(1) and (2). Counts Twelve through Fourteen charge Alexander Salvagno with filing a false Federal personal income tax return (Form 1040) in violation of 26 U.S.C. § 7206(1). *See* Dkt. No. 112, Indictment.

Currently before the court are defendants' motions: (1) to dismiss the RICO Conspiracy Count (Count One of the Indictment); (2) to dismiss the various substantive CAA Counts (Counts Three through Eleven); (3) to strike prejudicial surplusage from the Indictment; and, (4) for an order directing an evidentiary hearing to determine the nature and extent of, and the appropriate sanctions for, the disclosures made during the course of plea and cooperation negotiations and agreements by at least one co-defendant in violation of a pre-existing joint defense agreement. For the reasons that follow below, defendants' motion to dismiss the RICO Conspiracy Count (Count 1 of the Indictment) is DENIED; defendants' motion to strike prejudicial surplusage from the Indictment is DENIED; defendants' motion to dismiss the various substantive CAA Counts (Counts Three through Eleven) is DENIED without prejudice to renewal based on the evidence presented at trial; and, defendants' motion requesting the court to issue an order directing an evidentiary hearing to determine the nature and extent of, and the appropriate sanctions for, the disclosures made during the course of plea and cooperation negotiations and agreements by at least one co-defendant in violation of a pre-existing joint defense agreement is DENIED.

## BACKGROUND

### A. Relevant Procedural History

On February 13, 2002, the government indicted defendants and charged them with various crimes stemming from their asbestos abatement activities. Initially, the government charged seven additional individuals, Thomas Reed, Gary Alvord, Anthony Mongato, Sheon Dimaio, Michael Shanahan, Robert O'brey, and Gerald Lindquist, with crimes relating to their asbestos abatement activities. Since the government indicted them, the seven co-defendants have entered guilty pleas. Previously, the government brought an order to show cause why the court should not issue an order precluding consideration of motions filed by David Bernfeld and Jeffrey Bernfeld, or future appearances of any sort, in the absence of their having entered an appearance in this matter and having gained admission to practice law in the Northern District of New York, generally or for purposes of this case. This motion is now moot because both David Bernfeld and Jeffrey Bernfeld have entered their appearance in this matter and have gained admission to practice law in the Northern District of New York. Since their admission, however, the court granted the government's motion to disqualify Jeffrey Bernfeld from representing defendants Alexander Salvagno and AAR Contractor, Inc., as of February 27, 2003. *See* Dkt. No. 128, Mem. Decision and Order. For these reasons, the Government's order to show cause is moot.

## B. The Alleged Scheme

The alleged scheme is set forth in the Indictment and the government's response papers, which the court summarizes briefly as follows. From 1988 to 2000, Alexander and Raul Salvagno owned and operated AAR, which grew to be one of the largest asbestos abatement companies in New York State with a significant presence in Central and Upstate New York. Their asbestos abatement operation, however, is alleged to have failed to comply with various federal and New York State regulations, which apply to the removal of asbestos to protect workers, the public, and the environment.[1] In 1990, defendants allegedly devised and implemented a scheme that defrauded clients of millions of dollars through false representations as to how AAR would perform its asbestos abatement work. Dkt. No. 94, Government's Am. Resp. at 2–3.

In an effort to reduce their employees' "time-on-the-clock," the most costly component of asbestos abatement projects, defendants are alleged to have convinced a close friend, Timothy Carroll, to start an accredited laboratory and an air and project monitoring company, Analytical Laboratories of Albany, Inc., ("ALA"), in which Alexander Salvagno would secretly own a one-half share. By controlling ALA, defendants were able to circumvent air and project monitoring regulations and falsify test results. ALA, acting as an "independent" laboratory, would mail AAR's clients the falsified test results. Defendants defrauded their clients by leading them to believe that, and charging them as if, they performed the asbestos abatement in accordance with the applicable regulations when in fact they had not. This alleged scheme allowed defendants to complete their abatement projects in less time than

if they were to have adhered to the regulations. *Id.* at 3–5; Dkt. No. 112, Indictment at 9–10.

During the alleged conspiracy, Mr. Carroll deposited ALA-derived funds in his own bank account and subsequently withdrew half of those funds in cash and gave them to Alexander Salvagno. As part of their conspiratorial arrangement with Alexander Salvagno, ALA and Mr. Carroll filed false W–2 forms, which made it appear that Mr. Carroll received all of ALA's funds. ALA failed to provide a W–2 form to Alexander Salvagno and falsified its corporate tax returns while Alexander Salvagno's income tax returns failed to reflect the additional income he received from ALA. Alexander Salvagno also directed AAR to pay a "RASH Services, Inc.," instead of AAR's General Manager, Thomas Reed, a significant portion of Mr. Reed's salary in order to conceal Mr. Reed's true income and allow AAR to pay lower payroll taxes. Again, AAR filed false tax documents as did Mr. Reed. Dkt. No. 94, Government's Am. Resp. at 5–6; Dkt. No. 112, Indictment at 10–13. In addition, defendants are alleged to have obtained large sums of money through mail fraud, which in turn they committed to AAR in order to sustain and expand its illegal activities. *Id.* at 6.

## DISCUSSION

### I. Defendants' Motion to Dismiss RICO Count

Defendants move to dismiss the RICO Conspiracy Count (Count 1) arguing that the underlying acts upon which the government relies are insufficient to sustain such a charge. The government bases the RICO Conspiracy Count on money laundering predicates, which in turn rest upon

---

**1.** *See United States v. Thorn,* 317 F.3d 107, 111 (2d Cir.2003) for a discussion of applicable regulations.

an underlying mail and wire fraud scheme. Defendants contend that the conduct in support of the underlying mail and wire fraud does not, as a matter of law, constitute mail and wire fraud. Defendants also contest the Indictment's association-in-fact RICO enterprise, which it defines as an association of a certain and distinct group of seven separate legal entities. Defendants contend that most of these entities did not exist, legally or otherwise at the time the association-in-fact RICO enterprise allegedly formed. Moreover, they suggest that aside from AAR and ALA, the entities that comprise the association-in-fact enterprise were competitors with interests adverse to each other. Defendants also contend that the RICO Count is constitutionally vague. *See* Dkt. No. 102, Defs.' Mem. of Law in Supp. of Mot. at 2–3.

### A. Sufficiency of the Indictment

The standard for the legal sufficiency of an indictment is well-established. An indictment is sufficient when it contains the elements of an offense, notice to the defendant of the charges he must be prepared to meet, and information sufficient to protect the defendant from the risk of double jeopardy. *United States v. Bailey,* 444 U.S. 394, 414, 100 S.Ct. 624, 636, 62 L.Ed.2d 575 (1980). "An indictment need only track the language of the statute and, if necessary to apprise the defendant of the nature of the accusation against him, state the time and place in approximate terms." *United States v. Covino,* 837 F.2d 65, 69 (2d Cir.1988); *see United States v. Flaharty,* 295 F.3d 182, 189 (2d Cir.2002). Here, there is no evidence that the Grand Jury acted upon inadequate or incompetent evidence.

As to the conspiracy count, "in an indictment for conspiring to commit an offense-in which the conspiracy is the gist of the crime-it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy." *United States v. LaSpina,* 299 F.3d 165, 177 (2d Cir.2002) (citation omitted) (quoting *Wong Tai v. United States,* 273 U.S. 77, 81, 47 S.Ct. 300, 71 L.Ed. 545 (1927)). In order to succeed on their claim that the conspiracy count was insufficient, defendants "must show that the indictment, liberally construed, was insufficient to identify the offense which [they] conspired to commit." *LaSpina,* 299 F.3d at 177–78 (internal quotation and citations omitted). Defendants imply that the above standard is inadequate to address the complex scheme alleged in the instant case, and that even under the standard, the government failed to support the multiple layers of criminal accusations contained in the Indictment with sufficient detail. *See* Dkt. No. 102, Defs.' Mem. of Law in Supp. of Mot. at 35.

The above standard applies regardless of the complexity of the alleged criminal scheme. Moreover, the court notes that in its response, the government cited cases where criminal schemes at issue were not of the garden variety. *See United States v. Wydermyer,* 51 F.3d 319, 324 (2d Cir. 1995) (conspiracy to launder money derived from criminal violations of the Arms Export Control Act and false statements); *LaSpina,* 299 F.3d 165 (conspiracy to engage in monetary transactions with money derived from kickback scheme and tax violations).

### B. The Association–In–Fact Enterprise Is Sufficient

Defendants contend that the alleged conspiratorial enterprise cannot be comprised of entities that were not all in existence at the time the conspiracy began. Defs.' Mem. of Law at 26. This position, however, is untenable, for it defies the

reality of the way in which criminal associations operate, and is contrary to well-established jurisprudence. *United States v. Coonan,* 938· F.2d 1553, 1560–61 (2d Cir.1991) (finding the evidence established that regardless of membership changes, the association-in-fact's power structure endured); *cf. United States v. Bagaric,* 706 F.2d 42, 56·(2d Cir.1983) ("[I]t is logical to characterize any associative group in terms of what it *does,* rather than by abstract analysis of its structure."). The enterprise as charged in the Indictment is sufficient.

### C. Mail Fraud

■ Defendants claim that the RICO charge, predicated as it is primarily on mail fraud (as the specified unlawful activity of money laundering) cannot be sustained as a matter of law. They assert that the mail fraud statute does not encompass defendants' alleged scheme to defraud because the Indictment "do[es] not allow for proof that the deceived 'victims' of the purported wire or mail frauds suffered any tangible economic injury nor that such injury was intended or foreseen." Dkt. No. 102, Defs.' Mem. of Law at 9–10. Defendants' arguments, however, are inapposite. In the Indictment, the government makes clear that defendants' clients were not only deceived, but also defrauded because the artificially low bids were a good deal only if AAR performed the asbestos abatement in the manner agreed to and as required by law. *See* Dkt. No. 112, Indictment, at ¶¶ 11(c) and (d) and 12; *see also Thorn,* 317 F.3d at 112.

■ "The elements of mail fraud are: (1) a scheme or artifice to defraud, (2) furthered by the use of the mail, (3) to deprive another of money, property or the intangible right of honest services." *United States v. Handakas,* 286 F.3d 92, 100 (2d Cir.2002) (internal quotation marks omitted) (citing 18 U.S.C. §§ 1341 and 1346). The first element requires: (1) the existence of a scheme to defraud; (2) specific intent to defraud on the part of the defendant; and, (3) material misrepresentations. *United States v. Autuori,* 212 F.3d 105, 115 (2d Cir.2000). "The second element is satisfied if the mail is used or if its use is reasonably foreseeable." *Handakas,* 286 F.3d at 100 (citation omitted). The third element requires that there be a deprivation of money, property, or the "right to the intangible right of honest services." *Id.* (citing 18 U.S.C. §§ 1341 and 1346).

Defendants attack the "intangible right to honest services" element arguing that because the government's theory rests upon "nothing more than a scheme to deceive," the honest services clause is unconstitutionally vague. Dkt. No. 102, Defs.' Mem. of Law at 20. Defendants principally cite *Handakas* and *United States v. Rybicki,* 287 F.3d 257 (2d Cir.2002) in support of this position. *Handakas*

> upheld a vagueness challenge to [18 U.S.C.] § 1346 in the context of a bid contractor working for a state school authority who wilfully breached a contract requirement that he pay the prevailing wage to his employees. (citation omitted). After reviewing the language and history of § 1346, the panel concluded that the phrase "honest services" was too vague to give· notice to a person of ordinary intelligence that a "breach of contract could subject one to a mail fraud conviction." (citation omitted).

*Rybicki,* 287 F.3d at 263. The *Rybicki* court noted because § 1346 does not define "honest services," the statute's reach is "virtually limitless." *Id.* at 264. To address this concern, the *Rybicki* court adopted a reasonably foreseeable harm standard whereby "it must have been reasonably foreseeable·to the defendant that the scheme at issue could have resulted in

some economic or pecuniary harm to the victim." *Id.* The *Rybicki* court preferred the reasonably foreseeable harm standard because it focused "the inquiry on whether the scheme at issue created foreseeable risk of economic or pecuniary harm to the victim, which is consistent with traditional notions of fraud and fraudulent harm." 287 F.3d at 265. In addition, the reasonably foreseeable harm test had the "virtue of being capable of straightforward and consistent application, while at the same time placing a reasonable boundary around what is otherwise so boundless a concept as to be suitable for a candidate for a finding of unconstitutional vagueness" (citation omitted). *Id.* at 265. The court quickly added that "the foreseeable economic or pecuniary harm must be more than *de minimis,* in order to establish a minimum threshold that will exclude cases … that could result in some slight economic harm." *Id.* Thus, in order to establish the offense of honest services fraud pursuant to § 1346, the following elements must be satisfied: "(1) a scheme or artifice to defraud; (2) for the purpose of depriving honest services; (3) where it is reasonably foreseeable that the scheme could cause some economic or pecuniary harm to the victim that is more than *de minimis;* and, (4) use of the mails or wires in furtherance of the scheme." *Id.* at 266. While defendants discuss the Second Circuit's § 1346 jurisprudence in great detail, they fail to discuss 18 U.S.C. § 1341.

 18 U.S.C. § 1341 requires that the government prove that the defendant contemplated some actual harm or injury to the victim. *United States v. D'Amato,* 39 F.3d 1249, 1257 (2d Cir.1994). "A defendant who has used the mails fraudulently to bill a customer for services that have not been provided may not defeat a mail fraud charge simply by providing alternative services." *United States v. Frank,* 156 F.3d 332, 335 (2d Cir.1998) (citing *United States v. Wallach,* 935 F.2d 445,

461 (2d Cir.1991)) ("providing alternate services does not defeat a fraud charge [when] the [victims] did not receive the services that they believed they were being provided"); *United States v. Paccione,* 949 F.2d 1183, 1196 (2d Cir.1991) ("Use of the mails in furtherance of a scheme to offer services in exchange for a fee, with the intent not to perform those services, is within the reach of § 1341."). In *Frank,* municipalities contracted for sludge disposal at a site 106 miles from the New York and New Jersey Shores. Defendants, however, dumped sludge in waters short of the 106–mile site yet billed the municipalities as if all of the sludge disposal had occurred at the 106–mile site. 156 F.3d at 334–36. The Second Circuit found that defendants' alternative services did not defeat their mail fraud conviction. Here, defendants similarly argue that

> there is no dispute that the AAR clients, ultimately received the service for which they paid-the removal of asbestos material from their buildings. Nowhere does the government allege, or even imply, that the defendants, their associates, and co-conspirators received money for asbestos removal projects which were not ultimately performed. Indeed, the Government clearly alleges that the asbestos material was, in fact, removed-albeit illegally.

Dkt. No. 102, Defs.' Mem. of Law at 13. Applying the reasoning of *Frank,* defendants' argument is unavailing.

Similarly, in *Paccione,* the Second Circuit upheld a RICO prosecution based upon mail fraud. There, the government charged that defendants had schemed to defraud their medical customers of money and property by charging them high rates attributable to lawful transport, storage, and disposal of medical waste without providing those services lawfully, and had implemented that scheme through, *inter alia,*

mailings of letters and invoices to a certain doctor in violation of § 1341. This alleged scheme formed the basis for seventeen RICO predicate acts. *Paccione,* 949 F.2d at 1190–91. The Second Circuit reiterated that the mailing of communications that are designed to lull the victims of the fraud into believing they have received the services they bought is sufficient to support a conviction under § 1341. *Id.* at 1196. The Second Circuit then described defendants' scheme as one in which they

> offered to provide doctors with infectious waste disposal services that would be safe and adequate to relieve them of the risk of civil and criminal liability ... [where] there was no indication that any of its customers sought a lower level of service, and it was inferable that the payments of the doctors and the medical facilities were to be commensurate with the high level of services promised by [defendants]. [Defendants] mailed invoices designed to lull the customer into believing the services promised had been provided.

*Id.* at 1197. The Second Circuit concluded that such a scheme fit "comfortably within" § 1341's framework. *Id.* Here, the government has properly charged mail fraud.

### D. RICO Count is Supported

Defendants contend that "the only illegal conduct alleged by the government involves violations of the [CAA] and various New York State regulations" while the other conduct alleged is limited to "everyday business activity." Dkt. No. 102, Defs.' Mem. of Law at 23. Defendants misapprehend the charges at hand. The government has not charged RICO crimes in which the CAA or New York State regulations are predicate acts; rather, it has charged promotion and concealment money laundering with specified unlawful activities involving mail and wire fraud. *See* Dkt. No. 112, Indictment at 5–8. De-

fendants' motion to dismiss the RICO Conspiracy Count based upon money laundering is denied.

### II. Defendants' Motion to Strike Prejudicial Surplusage from the Indictment

Defendants move to strike prejudicial surplusage from the indictment arguing that should the court permit the government to present such surplusage at trial, the jury will be exposed to massive amounts of uncharged and irrelevant conduct. *See* Dkt. No. 73, Mem. of Law in Supp. of Mot. at 4. Defendants contend that the Indictment improperly attempts to escalate conduct, which if true, violates only state law, into a federal conspiracy. Defendants argue that the bulk of the conduct charged in furtherance of the CAA Conspiracy involves purported misconduct related to air monitoring which is neither regulated nor prohibited by the CAA. *See* Dkt. No. 102, Defs.' Mem. of Law at 40–41. Defendants argue that the CAA, as it pertains to asbestos removal, requires only: (1) that the asbestos material be wetted down during removal; (2) notification to the relevant agency that a CAA regulated job will occur; and, (3) disposal of asbestos in a particular manner. Defendants further allege that the CAA regulates and applies to asbestos removal projects involving a sufficient volume of material containing asbestos to meet the statutory requirements. Defendants' portrayal of the CAA as it pertains to asbestos removal, however, oversimplifies the Act's requirements. *See* Dkt. No. 112, Indictment, ¶ 140; 40 C.F.R. Part 61, subpart M; *United States v. Weintraub,* 273 F.3d 139, 144–45 (2d Cir.2001) (citing the C.F.R. regulations pertaining to asbestos violation and setting forth the general intent standards for such crimes).

▮▮▮▮▮ "Motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." *United States v. Scarpa,* 913 F.2d 993, 1013 (2d Cir.1990) (internal quotations omitted). " '[I]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken.' " *Scarpa,* 913 F.2d at 1013 (quoting *United States v. DePalma,* 461 F.Supp. 778, 797 (S.D.N.Y. 1978)). For example, "[i]n RICO cases, courts have refused to strike allegations of organized crime connections that serve to identify the enterprise and the means by which its members and associates conduct various criminal activities." *Id.* The Indictment not only sets forth the CAA's and the TSCA's standards at issue in the conspiracy count, but also sets forth certain conduct. Defendants are alleged to have engaged in this conduct as part of their method of operation, which enabled them to commit the CAA and TSCA violations. While conceding that such conduct may have violated state law, the government argues that such fact does not prohibit it from cited to such conduct to describe the methods employed in furtherance of the conspiracy.[2] Here, the allegations describe defendants' methods of operation—methods that are intertwined with the evidence regarding the charged offense. Therefore, they are not properly stricken. *See United States v. Mulder,* 273 F.3d 91, 99–100 (2d Cir.2001); *United States v. Hernandez,* 85 F.3d 1023, 1030 (2d Cir. 1996) (finding that defendants' cocaine-related activity was clearly relevant evidence of the organizational structure and method of operation of their heroine conspiracy).

Defendants protest that the government is attempting to prosecute them for state as opposed to federal crimes. Defendants contend that the four out of the five means and methods, set forth in paragraphs 143–47 of the Indictment, "involve conduct which relates solely to New York State law." Defendants further contend that the majority of the overt acts listed in paragraphs 149–60 of the Indictment do not come within the CAA's purview. *See* Dkt. No. 102, Defs.' Mem. of Law at 44. The government, however, demonstrates that the means and manner paragraphs and overt acts at issue relate to the charged conspiracy. More specifically, the majority of the overt acts relate directly to alleged violations of the CAA or TSCA or both. While some of the overt acts implicate both OSHA and state law violations relating to false air monitoring, it is this conduct that assisted the charged federal conspiracy to succeed. *See LaSpina,* 299 F.3d at 176 ("An overt act is meaningful only if it is within the scope of the conspiratorial agreement, but an overt act may be made only by a single one of the conspirators and it need not be itself a crime.") (internal quotations, alterations and citations omitted). Defendants' motion to strike prejudicial surplusage from the Second Superceding Indictment is denied.

### III. Defendants' Motion to Dismiss Substantive Clean Air Counts

▮▮▮▮ Defendants move to dismiss the CAA Count (Count 2). *See* Dkt. No. 71, Defs.' Notice of Mot. Defendants argue that the surplusage and defectively alleged overt acts so taint the CAA conspiracy charge that the entire count should be dismissed. Defendants move to dismiss

---

**2.** In this regard, the government states that it has no objection to, and would expect, a jury instruction stating that defendants can only be convicted for violations of the applicable federal laws relating to the CAA conspiracy count.

the various substantive CAA Counts (Counts 3–11) arguing that they fail to set forth key elements of the crime. Defendants protest that the government charges multiple defendants with each substantive count without identifying who engaged in what conduct; they contend that the government charged the substantive counts as if they were conspiracies where each party is ostensibly responsible for the acts of all others. Defendants also contend that the government fails to allege the volume of asbestos material involved in the project charged in each count. Dkt. No. 102, Defs.' Mem. of Law in Supp. of Mot. at 4, 40, 45, 49. Furthermore, defendants argue that the substantive CAA Counts are too vague and general to pass Constitutional muster. *See Id.* at 3, 50.

The government responds that it will prove that each CAA count conforms to the conduct of each defendant during the applicable time period. As noted above, an indictment is sufficient when it contains the elements of an offense, notice to the defendant of the charges he must be prepared to meet, and information sufficient to protect the defendant from the risk of double jeopardy. *United States v. Bailey,* 444 U.S. 394, 414, 100 S.Ct. 624, 636, 62 L.Ed.2d 575 (1980). "An indictment need only track the language of the statute and, if necessary to apprise the defendant of the nature of the accusation against him, state the time and place in approximate terms." *United States v. Covino,* 837 F.2d 65, 69 (2d Cir.1988); *see United States v. Flaharty,* 295 F.3d 182, 189 (2d Cir.2002). The CAA counts pass constitutional muster.

The government acknowledges that the CAA's regulations are triggered only where the asbestos containing material is at least 260 linear feet, 160 square feet or one cubic meter facility components where the length or area could not be measured previously. Dkt. No. 94, Government's Am.

Resp. at 28 (citing 40 C.F.R. § 61.145(a)(1)(i) and(ii)). The Indictment incorporates this understanding as well. Dkt. No. 112, Indictment at ¶¶ 138, 140, 142, 215–16. Defendants specifically reference Paragraphs 187, 202, 203, 204 and 205 as having failed to set forth any threshold amount. Dkt. No. 102, Defs.' Mem. of Law in Supp. of Mot. at 45. While these paragraphs do not reference any threshold, the introductory portion of this part of the Indictment sets forth the threshold amount. Dkt. No. 112, Indictment at ¶ 138. Furthermore, the government assures the court that "[t]o the extent that [defendants] maintain the United States will be unable to show certain projects named in the conspiracy count involved the required amount of regulated containing material, they are simply wrong." Dkt. No. 94, Government's Am. Resp. at 29. Based upon the government's assurance, defendants' motion to dismiss the substantive clean air counts is denied without prejudice to renewal based on the evidence presented at trial.

## IV. Defendants' Motion for Court Order Directing an Evidentiary Hearing Regarding Joint Defense Agreement

Defendants requested that the court order an evidentiary hearing to determine the nature and extent of, and the appropriate sanctions for, the disclosures made during the course of plea and cooperation negotiations and agreements by at least one co-defendant in violation of a pre-existing joint defense agreement. *See* Dkt. No. 71, Defs.' Notice of Mot. Defendants contend that a joint defense agreement existed between, *inter alia,* defendants Thomas Reed, AAR Contractor, Inc., and Alexander Salvagno at the time that Mr. Reed negotiated for and entered into his plea and cooperation agreement with the government. Defendants contend that Mr.

Reed and his counsel, as parties to the joint defense agreement, learned of various materials and defense strategies and then breached the joint defense agreement when they allegedly disclosed the same to the government. As a result of this alleged violation, defendants contend that the government wrongfully obtained attorney-client privileged communications, work-product, and other privileged information. Defendants contend that the government was aware of the joint defense agreement and its legal obligations with respect thereto. *See* Dkt. 72, David Bernfeld Aff. at ¶¶ 3 and 4.

Defendants contend that the government has effectively conceded the facts constituting *prima facie* evidence that a violation occurred: (1) by letter dated July 11, 2002, AUSA Benedict wrote to the court and advised that "[o]n June 11, 2002, following the receipt of specific information from now cooperating defendant Thomas Reed that Alexander Salvagno/AAR possessed voluminous documents that constitute reciprocal discovery, the United States made written demand to Mr. Bernfeld."; and (2) at the court conference in chambers on July 15, 2002, AUSA Benedict made this concession orally, namely that he had learned of the existence of specific alleged Rule 16 discovery materials from a cooperating witness, Mr. Reed, and had made demand for that material following the disclosure of its existence.[3] Dkt. No. 100, David Bernfeld Aff. at ¶ 2.

The June 11, 2002, letter requested defendants to

provide all reciprocal discovery required by the Pre-trial Order and the Federal Rules of Criminal Procedure, including but limited to copies of all tape recorded conversations made by Alex Salvagno, Thomas Reed, William Margi, Gary Alvord, or any other individual to Federal or State regulatory officials or anyone else with regard to asbestos matters; all letters received from former AAR clients relating to work performed; copies of documents received from regulatory agencies pursuant to either the Freedom of Information Act or the New York Freedom of Information Law, and all videos or pictures taken at work sites that are the subject of the Indictment, including but not limited to, cleanups conducted to abate asbestos left behind following the completion of projects.

Dkt. No. 95 Government's Resp. in Opp'n to Mot. for Evidentiary Hr'g at 7. Defendants argue, therefore, that they are entitled to a hearing to determine the nature and extent of the violations. Depending on the extent of the violation, defendants seek remedial sanctions including the preclusion of Thomas Reed as a witness, the preclusion of the use of evidence if disclosed, and a sanction addressed to the continued prosecution of this matter should the alleged violation have occurred

---

**3.** The letter referenced by David Bernfeld is one in which the Government summarized the procedural history of the case to date. *See* Dkt. No. 61. Its entry for June 11, 2002, summarized a letter of the same date in which the Government demanded reciprocal discovery. The Government's summary of the June 11, 2002, written demand introduced information beyond that which was contained in the original letter. While the June 11, 2002, letter states, "the United States has received no reciprocal discovery whatsoever, notwithstanding our understanding that your clients possess voluminous documents beyond those subpoenaed or taken by the United States during the execution of search warrants," the July 11, 2002, letter states, "following the receipt of specific information from now cooperating co-defendant Thomas Reed that Alexander Salvagno/AAR possessed voluminous documents that constitute reciprocal discovery, the United States made written demand to Mr. Bernfeld." *Compare* Dkt. No. 95 Government's Resp. in Opp'n to Mot. for Evidentiary Hr'g at 7 *with* Dkt. No. 61.

with actual knowledge of the Government. *See id.* at ¶ 3.

The government dismisses defendants' argument pertaining to the alleged violation of the joint defense agreement asserting that the motion's purported facts "are based solely upon conjecture . . . and lack any supporting evidence." Dkt. No. 82, Government's Mem. of Law in Supp. of Mot. to Compel Reciprocal Disc. at 2. The government denies having ever acknowledged, explicitly or implicitly, any violation of a joint defense agreement. *See* Dkt. No. 95, Government's Resp. in Opp'n to Mot. for Evidentiary Hr'g at 2. The government argues that defendants failed to meet the standard for a suppression or evidentiary hearing and thus submit that such hearings are not warranted. *See* Dkt. No. 82, Government's Mem. of Law in Supp. of Mot. to Compel Reciprocal Disc. at 2 –3 and Dkt. No. 95, Government's Resp. in Opp'n to Mot. for Evidentiary Hr'g at 3–5.

 The joint defense agreement, or common-interest rule, is an extension of the attorney-client privilege which "serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." *United States v. Schwimmer,* 892 F.2d 237, 243 (2d Cir. 1989). The Second Circuit adheres to a strict interpretation of the common-interest rule such that "[o]nly those communications made in the course of an ongoing common enterprise and intended to further the enterprise are protected." *Id.; see United States v. Weissman,* 1996 WL 737042, at *9 (S.D.N.Y. December 26, 1996) ("[T]he Second Circuit . . . is unwilling to infer a joint defense agreement from the simple circumstance of a general purpose meeting held to discuss matters of common interest."). The attorney-client

privilege attaches: "(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived." *United States v. Int'l Bhd. of Teamsters,* 119 F.3d 210, 214 (2d Cir.1997). The party asserting the joint defense agreement always bears the burden of demonstrating its existence by establishing each element of the attorney client privilege. *See id.* A claim resting on the common-interest rule requires a showing " 'that the communication in question was given in confidence and that the client reasonably understood it to be so given.' " *United States v. Weissman,* 195 F.3d 96, 99 (2d Cir.1999) (quoting *Schwimmer,* 892 F.2d at 244).

 Here, it is clear that a joint defense agreement exists between, *inter alia,* Mr. Reed and Alexander Salvagno. In his affidavit, Mr. Reed's attorney, Michael S. Ross, avers that there is a joint defense agreement in effect among counsel and their clients, which provides the standard protections inherent in any joint defense agreement. *See* Dkt. 95, Government's Resp. in Opp'n to Mot. for Evidentiary Hr'g at Ex. 2, Ross Aff. at ¶ 5. The court now turns to whether it must convene a hearing to determine alleged violations of the joint defense agreement.

Defendants cite no case discussing the court's *obligation* to hold a hearing in a criminal trial premised upon a cooperating co-defendant's alleged violation of a joint defense agreement. The government found no case that directly discussed the obligation of a court to hold a hearing in a criminal case premised upon a cooperating co-defendant's alleged violation of a joint defense agreement. The government,

however, discussed analogous cases. *See* Dkt. 95, Government's Resp. in Opp'n to Mot. for Evidentiary Hr'g at 3. Similarly, while the court's independent research uncovered no case directly on point, it too found analogous cases.

A few courts have assumed that the prosecution in a criminal case *could* violate a defendant's constitutional rights by receiving information from cooperating codefendants (or their attorneys) that was obtained through a joint defense agreement but have not so found. *United States v. Aulicino*, 44 F.3d 1102, 1117 (2d Cir. 1995) sets forth the test to determine whether a hearing is required: "assuming that the government has not interfered with the attorney-client relationship deliberately, the defendant bears the burden of 'alleg[ing] specific facts that indicate communication of privileged information to the prosecutor and prejudice resulting therefrom.'" 44 F.3d at 1117 (citing *United States v. Ginsberg*, 758 F.2d 823, 833 (2d Cir.1985)). In *Aulicino*, defendants argued that their Sixth Amendment right to counsel was violated by an individual when he attended a joint defense meeting after having entered into negotiations with the government to act as a cooperating witness. The district court declined to conduct a hearing on the matter. 44 F.3d at 1117. The Second Circuit held that defendants did not satisfy the test because: (1) the government presented evidence of the steps it took to insulate the prosecutors from any knowledge gained by the cooperating witness from his contact with the codefendants after he agreed to cooperate; (2) defendants did not present any evidence to suggest that the cooperating witness revealed any privileged information to the government; and, (3) defendants' contention that they had no way of knowing the extent of any prejudice they might have suffered was supported only by speculation. *Aulicino*, 44 F.3d at 1117; *but see United States v. Hsia*, 81 F.Supp.2d 7 (D.D.C.2000).[4]

Applying the reasoning of *Aulicino*, the court denies defendants' motion requesting an order directing an evidentiary hearing. Defendants have failed to allege specific facts that indicate communication of privileged information to the Government and prejudice resulting therefrom. Moreover, the government avers that it neither sought nor accepted any attorney-client or work product privileged information. The government contends that none of the re-

[4]. In *Hsia,* the court convened an evidentiary hearing on defendant's motion to dismiss her indictment. The government had allegedly obtained and used information protected by the attorney-client and joint defense privileges in violation of her rights. In the opinion that followed, the court applied a four-pronged test set forth by the District of Columbia Circuit in *United States v. Kelly,* 790 F.2d 130, 137 (D.C.Cir.1986) to determine whether defendant had been sufficiently prejudiced when the government allegedly intruded upon her attorney-client privilege to have constituted a Sixth Amendment violation: (1) whether evidence to be used at trial was obtained directly or indirectly by the alleged intrusion; (2) whether the alleged intrusion by the government was intentional; (3) whether the prosecution received otherwise confidential information about trial prepara-tions or defense strategy as a result of the alleged intrusion; and (4) whether the privileged information was used to the substantial detriment of the defendant." The court determined that defendant failed to satisfy the first prong that privileged information had passed to the government without defendant's consent where her attorneys testified that they did not pass any privileged information to the government, and the government confirmed that, to its knowledge, it had received no such information. The court further determined that defendant failed to satisfy the second prong because even if an intrusion into the joint defense agreement occurred, defendant did not prove that such intrusion was intentional and concluded that defendants' Sixth Amendment rights had not been violated.

quested reciprocal discovery materials-the tape recorded conversations made by Alexander Salvagno, Mr Reed, Mr. Margi, Mr. Alvord, or any other individual of federal or state regulatory officials, letters defendants received from their former clients, documents received from regulatory agencies, and videos or pictures of work sites that are the subject of the Indictment-have any indicia of attorney-client or work product privilege. The government further asserts that Alexander Salvagno allowed AAR employees, who were not parties to any joint defense agreement, to observe creation and/or collection of these materials. *See* Dkt. 95, Government's Resp. in Opp'n to Mot. for Evidentiary Hr'g at 8–9.

The government avers that it received information regarding the materials' existence from these AAR employees long before Mr. Reed ever began to cooperate with the United States. For example, the government avers that on March 7, 2002, Mr. Alvord, AAR's former Project and Operations Manager, in the presence of his counsel, informed it of the existence of the items set forth in the Government's request for reciprocal discovery. Mr. Alvord advised the Government: that AAR employees, at the direction of Alexander Salvagno, secretly tape recorded conversations with various federal and state officials; that AAR employees were aware that their company had taken photographs and videos of various sites believed to be under investigation by the EPA; that Alexander Salvagno and others at his request, sought a large number of documents pursuant to Freedom of Information laws; and, that Alexander Salvagno had sought to obtain letters from former clients to the effect that AAR had adequately completed the work its clients had hired it to complete. Mr. Alvord and his attorney advised that they were never members of any Joint Defense Agreement. Moreover, Alvord advised that the information he provided to the govern-

ment was of his own personal knowledge, that he gained such knowledge without any assistance from Alexander Salvagno's attorneys, and that he was under no obligation to keep such information secret. *See* Dkt. 95, Government's Resp. in Opp'n to Mot. for Evidentiary Hr'g at Ex. 1, Benedict Aff. at ¶¶ 7–8.

Months after having debriefed Mr. Alvord, the Government was contacted by Mr. Ross, counsel for Mr. Reed, who advised that his client wished to cooperate with the United States. In discussing terms for cooperation and a plea disposition, the government and Mr. Ross spoke in detail regarding the need to ensure that no information to be conveyed by Mr. Reed (or Mr. Ross) would violate any pre-existing privilege. On May 31, 2002, the government debriefed Mr. Reed, who was accompanied by Mr. Ross. The government and Mr. Ross began the meeting by discussing, in Mr. Reed's presence, the need to ensure that no privileged information was conveyed to the United States. Mr. Reed and Mr. Ross agreed that they would not convey such information. Dkt. 95, Government's Resp. in Opp'n to Mot. for Evidentiary Hr'g at Ex. 1, Benedict Aff. at ¶¶ 10–11.

The government supports its assertions with the affidavit of Mr. Ross who vigorously denies defendants' allegations that the joint defense agreement was breached. He avers that he prepared the joint defense agreement and executed it with David Bernfeld in June of 2000. He avers that the agreement insulates from disclosure information which was disclosed pursuant to, or derived from, the joint-efforts of the lawyers and the clients working together. It did not, however, prevent Mr. Reed from cooperating as a witness or from disclosing information he learned prior to the beginning or independently of the joint defense effort. Mr. Ross notes

that the joint defense agreement reflects the proposition that any client-participant could withdraw from the agreement, albeit in a way that does not divulge privileged information. Dkt. 95, Government's Resp. in Opp'n to Mot. for Evidentiary Hr'g at Ex. 2, Ross Aff. at ¶ 5. He avers that he and the government took affirmative steps to ensure that information provided to the government by Mr. Reed did not violate the joint defense arrangement. Before meeting with the government, Mr. Ross explained to Mr. Reed the joint defense agreement's prohibition against disclosing to the government, directly or indirectly, any information obtained pursuant to the joint defense agreement. Mr. Ross avers that the government emphasized that Mr. Reed should not under any circumstances directly or indirectly advise it of any information obtained pursuant to the joint defense agreement. Mr. Ross indicates that the government repeated that stricture on several occasions as a prophylactic measure. Dkt. 95, Government's Resp. in Opp'n to Mot. for Evidentiary Hr'g at Ex. 2, Ross Aff. at ¶ 6 Mr. Ross avers that Mr. Reed did not disclose any information he learned through the joint defense agreement. Dkt. 95, Government's Resp. in Opp'n to Mot. for Evidentiary Hr'g at Ex. 2, Ross Aff. at ¶¶ 7, 10. Under these facts and representations, the court concludes that the reciprocal discovery requested by the government does not constitute attorney-client or work product privilege; rather, it constitutes non-privileged information. Defendants' motion for an evidentiary hearing is denied.

## CONCLUSION

**WHEREFORE,** defendants' motion to dismiss the RICO Conspiracy Count (Count 1 of the Indictment) is DENIED; defendants' motion to strike prejudicial surplusage from the Indictment is DENIED; defendants' motion to dismiss the various substantive CAA Counts (Counts Three through Eleven) is DENIED WITHOUT PREJUDICE to renewal based on the evidence presented at trial; and, defendants' motion requesting the court issue an order directing an evidentiary hearing to determine the nature and extent of, and the appropriate sanctions for, the disclosures made during the course of plea and cooperation negotiations and agreements by at least one co-defendant in violation of a pre-existing joint defense agreement is DENIED.

**IT IS SO ORDERED.**