UNITED STATES of America

v.

**Charles LeCROY, Anthony C. Snell.**

**Criminal Action Nos. 04–370–7, 04–370–8.**

United States District Court, E.D. Pennsylvania.

Dec. 17, 2004.

Amended on Reconsideration Jan. 10, 2005.

Michael A. Schwartz, Richard J. Zack, Robert A. Zauzmer, Joan L. Markman, William B. Carr, Jr., United States Attorney's Office, Philadelphia, PA, for Plaintiff.

Catherine M. Recker, Lisa A. Mathewson, Welsh & Recker, P.C., Thomas H. Suddath, Jr., Lathrop B. Nelson, III, Montgomery, McCracken, Walker and Rhoads, L.L.P., Philadelphia, PA, for Defendants.

### MEMORANDUM

BAYLSON, District Judge.

Defendants Charles LeCroy and Anthony C. Snell are charged in Counts 26 and 27 of this indictment with wire fraud under 18 U.S.C. §§ 1343 and 2, for allegedly soliciting and obtaining from Philadelphia attorney Ronald White (originally a named co-defendant in this case but now deceased) a false $50,000 invoice presented to J.P. Morgan Chase ("JPMC") for legal services purportedly performed by White's law firm.

The issue presented is whether this Court should preclude the government from using certain notes and memoranda it has in its possession, which were taken by JPMC counsel during interviews held with JPMC employees LeCroy and Snell by JPMC counsel, or whether these notes and interviews are protected by either the attorney-client privilege and/or a joint defense agreement entered into by counsel for LeCroy, Snell and JPMC.

### I. Procedural History

During the grand jury investigation which preceded the return of the indict-

ment in this case on June 29, 2004, JPMC, as well as Defendants LeCroy and Snell, received grand jury subpoenas. As set forth in further detail below, JPMC's internal counsel questioned LeCroy and Snell about their knowledge of the facts underlying the grand jury subpoena, recognized their need for individual counsel, and JPMC itself retained outside counsel in Philadelphia. LeCroy and Snell were then given recommendations for lawyers and retained their own individual counsel. A Joint Defense Agreement arose, and during the discussions among counsel for JPMC, LeCroy and Snell, JPMC counsel indicated a desire to interview LeCroy and Snell at various times. As the government had requested, JPMC subsequently decided that it would produce, pursuant to its grand jury subpoena, the notes and/or memoranda of the meetings between JPMC counsel and LeCroy and Snell.

Following the return of the indictment, LeCroy and Snell asserted claims of privilege with respect to notes and memoranda of interviews created by counsel for JPMC. The government designated two attorneys who were not connected with the prosecution of the indictment to maintain custody and control of these notes and memoranda, and constructed a "Chinese wall" between the government attorneys who were the prosecutors on the indictment, and the government attorneys designated to represent the government in connection with the claims of privilege by LeCroy and Snell, pursuant to a similarly suggested procedure in *United States v. Weissman*, 22 F.Supp.2d 187 (S.D.N.Y. 1998), aff'd, 195 F.3d 96 (2d Cir.1999).

On August 17, 2004, the government filed a motion for a hearing to resolve claims of privilege; following briefs, a hearing was held on September 29, 2004. Although most of the testimony was taken in open court, certain testimony relating to the substantive communications between Defendants and their own personal counsel, and with JPMC counsel, was taken *in camera* and sealed, along with the exhibits used at the closed portion of the hearing. The parties filed extensive (and excellent) briefs on the issues and further argument was held on December 13, 2004, following which certain notes and memoranda were held protected by the claims of privilege, but certain other notes and memoranda were not, with a brief statement of reasons. *See* Tr. of 12/13/04 at pp. 31–35. An Order was filed, Docket No. 282.[1]

---

1. This Memorandum Opinion is being filed because Defendants Snell and LeCroy have filed a notice of appeal from the Court's Order. The Court advised defense counsel at the hearing that if they sought a stay of the Order or of the trial itself, they could represent that the stay had been denied. The trial of LeCroy, Snell and a third Defendant, Carlson, is scheduled to begin on January 18, 2005. Also, on December 13, 2004, LeCroy and Snell filed a separate motion for continuance of the trial, asserting that some delay in discovery from the government warranted a continuance. The Court held a hearing on this motion on December 16, 2004 and ordered the government to expedite its production of certain documents.

For the reasons extensively stated in the Court's prior Opinion of December 2, 2004, and at the hearing on December 16, 2004, the Court believes that defense counsel have had adequate time to prepare for trial and that the trial start date of January 18, 2005 is, under all circumstances, fair and will not deprive any LeCroy and Snell of a fair trial. As to the documents as to which this Court has now rejected the privilege claims of LeCroy and Snell, it must be noted that their use at trial is, at this point, entirely hypothetical and theoretical, if only because the government prosecutors have not seen the documents. It is unknown whether they will be used at all, and if so, whether they would be used as admissions during the government's case in chief, or only for impeachment. If it is the latter, that would not be known until and unless either Defendant testified, and if he testified, whether his testimony was inconsistent with

## II. *Factual Background*

At issue are seven different categories of notes and/or documents, identified as being in the government's possession, received from JPMC counsel as follows:

A. Scott Campbell's notes of discussions with Snell, dated 10/20/03, 10/21/03, 10/27/03, 10/29/03.

B. Scott Campbell's notes of discussions with LeCroy, dated 10/20/03, 10/27/03, 10/29/03, 12/11/03.

C. Dodds' notes of his 10/27/03 discussions with Snell and LeCroy.

D. April 19, 2004 memorandum regarding January 7, 2004 interview of Snell.

E. April 19, 2004 memorandum regarding January 14, 2004 interview of LeCroy.

F. April 19, 2004 memorandum regarding March 4, 2004 interview of Snell.

G. April 19, 2004 memorandum regarding March 4, 2004 interview of LeCroy.

Defendant Snell was served with a grand jury subpoena at his JPMC office in Atlanta, GA on or about October 17, 2003, and promptly advised Scott Campbell, JPMC's Senior Vice President and Associate General Counsel. Campbell was aware that JPMC itself had received a grand jury subpoena at or about the same time. Campbell had discussions with Snell and his supervisor, LeCroy, on October 20, 2003. At that time, the Court finds Snell and LeCroy were speaking to Campbell in their capacity as JPMC employees. Campbell was acting as JPMC counsel, and there were no discussions about either Snell or LeCroy having individual counsel. The discussions were preliminary and purely exploratory.

As a result of further discussions with Snell on the following day, October 21, 2003, and with both Snell and LeCroy on October 27, 2003, JPMC recognized the need for both of these individuals to have individual counsel and so advised them of this fact. At this time JPMC itself retained outside counsel, Jack Dodds, Esquire, a Philadelphia lawyer with experience as both a prosecutor and a defense counsel. Up to and including October 27, 2003, Snell and LeCroy did not seek personal legal advice from Campbell; they had no expectation of getting personal legal advice from Campbell and they did not ask for it. JPMC made recommendations to LeCroy and Snell of certain Philadelphia attorneys to represent them in connection with the grand jury investigation. As previously established in another proceeding in this case, JPMC agreed to pay the legal fees of Snell and LeCroy, and the Court has previously determined that those arrangements did not present any conflict of interest issue. (*See* Tr. of 8/6/04).

Snell retained his counsel, Thomas H. Suddath, Jr., Esquire on or about October 30, 2003 (Tr. p. 41).[2] LeCroy retained his counsel, Catherine M. Recker, Esquire, in the time period of November 10–13, 2003.[3] Both Suddath and Recker are Philadelphia

---

the statements he had made to JPMC counsel in January or March 2004.

**2.** References to the record refer to the pages of the transcript of the hearing in open court held on September 29, 2004. Certain testimony was taken from the individual defendants and their counsel *in camera,* as it pertained to specific attorney-client communications, and that *in camera* testimony will be referred to separately.

**3.** The slight delay in the retention of counsel for LeCroy occurred because another attorney, whose name had been given to LeCroy, was unable to accept that representation.

lawyers experienced in grand jury investigations.

The Court finds that JPMC intended to form a Joint Defense Agreement ("JDA") prior to LeCroy and Snell retaining personal counsel. Campbell's handwritten notes for the meeting of October 27, 2003, state "we will work going forward on a joint defense basis." *See* Exhibit A to LeCroy's response and *in camera* transcript, p. 72. Campbell testified that at the October 27 meeting he informed LeCroy and Snell that he was speaking to them in his capacity as counsel for JPMC and that he was going to "recommend counsel to represent their personal interests." (Tr. p. 41) As soon as Suddath and Recker were retained, they confirmed the existence of the JDA with Dodds.

The government does not dispute the existence of a JDA in this case. The JDA was verbal, and although its terms were never specifically articulated, Recker accurately described her understanding of the JDA as follows:

> The joint defense arrangement, primarily the focus is twofold. One, that the lawyers are able to investigate facts and share the results of their investigation with each other, keeping everything under the cloak of privilege. The second important part in the understanding of a joint defense arrangement is that none of that information that has been shared pursuant to the privilege can be disclosed to a third party without the consult—consent of all the parties involved.

(Tr. p. 12).

Suddath testified that he had a similar understanding of the JDA (Tr. p. 44). From these facts, the Court concluded that the discussions which took place between JPMC counsel and LeCroy and Snell after October 27, 2003, specifically on October 29, 2003 as to both, and on December 11, 2003 with LeCroy, are protected by the JDA. During these meetings, both LeCroy and Snell had reason to believe that their discussions with either their own counsel or JPMC counsel were protected from disclosure.

Recker testified that her understanding of the contents of the JDA, when entered into with Dodds, had a basis in a prior matter in 2000, in which they had been participants in a written JDA entered into with respect to their representation of separate clients in a different government investigation. *See* Exhibit marked LeCroy 1 at the hearing.[4] This "template" for the present JDA is significant because it explicitly contains two provisions that would allow one party to unilaterally, but only prospectively, withdraw from the JDA, as follows:

> 9. In the event any undersigned counsel determines that his or her client no longer has, or will no longer have, a mutuality of interest in a joint defense, such counsel will promptly notify the other undersigned counsel of his or her withdrawal from this Agreement, which will thereupon be terminated as to that client; provided, however, that such termination shall not affect or impair the obligations of confidentiality with respect to Defense Materials previously furnished pursuant to this Agreement.
> 11. Should any client desire to withdraw from this Agreement, his or her counsel shall provide prior written notice to the other undersigned counsel, in which case this Agreement shall no longer be operative as to the withdrawing client and his or her counsel, but shall continue to protect all Defense Materials disclosed to the withdrawing client and

---

4. Although all of the exhibits at the hearing were impounded, this document can be released because all of the names of the clients involved have been redacted.

his or her counsel prior to such withdrawal. The withdrawing client and his or her counsel shall promptly return all written Defense Materials and shall continue to be bound by the obligations of confidentiality with respect to Defense Materials previously furnished pursuant to this Agreement.

The present dispute graphically arose in discussions between Recker and Suddath, representing their individual clients, and Dodds, representing JPMC, in January 2004. JPMC counsel wanted to interview both LeCroy and Snell again. Dodds, outside counsel for JPMC, notified Recker and Suddath that government counsel advised JPMC that it was interested in seeing the notes of JPMC counsel's interviews with LeCroy and Snell. Dodds informed Recker and Suddath that JPMC would turn the notes over to the government if it insisted. (Tr. pp. 84–86). On January 7, 2004, Suddath testified he spoke with Campbell and Dodds about the government's interest in seeing the notes, and that he advised JPMC counsel that JPMC could not turn the notes over because it would violate the JDA (Tr. p. 51–52). Snell also understood JPMC's position. (Tr. *in camera* p. 67–68). Despite the disagreement, Snell was interviewed by Campbell and Dodds on January 7, 2004.

Recker testified that she had a similar conversation with Dodds on January 13, 2004 (Tr. p. 20) and that Dodds advised her that although JPMC counsel would resist such requests for production, JPMC "would waive the privilege if the govern-

ment pushed, and [Recker] disagreed that he had the ability to do that." (Tr. p. 21). Recker advised LeCroy of JPMC's position. (Tr. *in camera* p. 9). Despite her disagreement with Dodds, Recker and her client LeCroy went to New York City where JPMC counsel interviewed LeCroy on January 14, 2004.

When Recker was advised by Dodds that JPMC was reserving its right to turn over the notes, she believed that under the relevant case law, JPMC could not do so. She testified as follows:

> A party [to the JDA] couldn't do so. They would not be able to do so pursuant to the terms of the agreement, or under the case law, or under the ethics rules unless they received the written consent of all the parties to the agreement.

(Tr. p. 18). Suddath testified similarly (Tr. p. 48).

The testimony is undisputed that Dodds, on behalf of JPMC, was consistent and insistent to both Suddath and Recker that if the government pushed, JPMC would turn over the interview notes taken by JPMC counsel, to the government. Despite this clear warning, LeCroy and Snell went to New York on separate dates in January 2004 and were interviewed by JPMC counsel with their own counsel present.[5]

The March 4, 2004 interviews of Snell and LeCroy were taken without their individual counsel present, and they did not know that the meeting was going to occur.

---

**5.** The facts related by the various counsel who testified at the hearing on September 29, 2004 on this matter were essentially consistent. There was a slight variation in the recollections of Recker and Dodds as to their telephone call, which took place on approximately January 13, 2004, just prior to the New York City meeting on January 14, 2004. Recker had a clear recollection that she told Dodds that JPMC had no legal authority to turn over the notes of its counsel (Tr. p. 38–39); Dodds did not deny that she said that, but could not recall it (Tr. p. 86). The Court will give Recker's distinct recollection full credibility in assessing the issue, but under the Court's analysis, the dispute is not material.

### III. *Legal Principles of a Joint Defense Agreement*

Although the Third Circuit has not specifically ruled on the applicability of a joint defense agreement in any similar factual situation, it has described a joint defense agreement.[6] *See Matter of Bevill, Bresler & Schulman Asset Management Corp.,* 805 F.2d 120, 126 (3d Cir.1986) (holding under the facts of that case, no joint defense privilege was established, but stating that the joint defense privilege protects communications between an individual and an attorney for another when the communications are part "of an ongoing and joint effort to set up a common defense strategy" (*quoting Eisenberg v. Gagnon,* 766 F.2d 770, 787 (3d Cir.1985)), and noting that "communications to an attorney who established a common defense strategy are privileged even though the attorney represents another client with some adverse interests.").

■ "Because the privilege sometimes may apply outside the context of actual litigation, what the parties call a 'joint defense' privilege is more aptly termed the 'common interest' rule." *In re Grand Jury Subpoena, A. Nameless Lawyer,* 274 F.3d 563, 572 (1st Cir.2001). The burden of demonstrating the existence of a joint defense agreement falls on the person claiming it. *United States v. Weissman,* 195 F.3d 96 (2d Cir.1999). A party seeking to assert the joint defense privilege must demonstrate that: 1) the communications were made in the course of a joint defense effort; 2) the statements were made in furtherance of that effort; and 3) the privilege has not been waived. *Bevill,* 805 F.2d at 126. Likewise, the party asserting privilege, both in the context of joint defense agreements and otherwise, bears the burden of proving the applicability of the privilege. *Id.* (citing *Grand Jury Empanelled February 14, 1978,* 603 F.2d 469, 474 (3d Cir.1979)). In the absence of a JDA, when the party asserting privilege is a corporate officer, the individual corporate officer's assertion of attorney-client privilege cannot prevent the disclosure of corporate communications with corporate counsel when the corporation's privilege has been waived. *Bevill,* 805 F.2d at 124–25. *See also Nameless Lawyer,* 274 F.3d at 573 (holding that in the absence of a JDA, "a corporation may unilaterally waive the attorney-client privilege with respect to any communications made by a corporate officer in his corporate capacity, notwithstanding the existence of an individual attorney-client relationship between him and the corporation's counsel").

■ Although "privileges should be narrowly construed and expansions cautiously extended," *Weissman,* 195 F.3d at 100, courts have found that an oral joint defense agreement may be valid. *See Nameless Lawyer,* 274 F.3d at 569–70. A person need not be a litigant to be a party to a joint defense agreement. *See Russell v. General Electric,* 149 F.R.D. 578 (N.D.Ill. 1993) (noting that the joint defense privilege applies to parties or potential parties sharing a common interest in the outcome of a particular claim).

■ It is axiomatic that in order for a communication to be privileged that communication must be made in confidence. *See Grand Jury Empanelled February 14, 1978,* 603 F.2d 469, 474 (3d Cir.1979) (specifying that a communication be "made in confidence" as one of the eight elements for assertion of the privilege). Even in the

---

6. *See generally* PAUL S. DIAMOND, FEDERAL GRAND JURY PRACTICE AND PROCEDURE § 7.02(B) (4th ed.2001).

context of joint defense agreements, in order for privilege to attach to a communication, the party asserting the privilege bears the burden of demonstrating that "the communication was given in confidence and that the client *reasonably understood it to be so given.*" *United States v. Schwimmer,* 892 F.2d 237, 244 (2d Cir. 1989) (emphasis added).[7] Additionally, the burden is on the party asserting a joint defense privilege to demonstrate that the clients reasonably believed that their statements were being made within the context and in furtherance of their joint defense. *Higgins v. Eichler,* 1997 WL 325779, *1 (E.D.Pa.1997) (citing *In re Grand Jury Subpoena Duces Tecum,* 406 F.Supp. 381, 389 (S.D.N.Y.1975)).

## IV. *Application of Legal Principles to the Facts of this Case*

As agreed at the hearing on December 13, 2004, no reported decision on a JDA appears to address or even come close to the facts presented in this case. Therefore, the Court must apply the basic principles surrounding attorney-client privilege and joint defense privilege in coming to a decision.

A JDA is not an escape-proof prison. Indeed, public policy mandates that a participant in a JDA must be free to withdraw from it, unilaterally, but the withdrawal or waiver must be prospective only—and the duty of the Court in the present dispute is to determine whether there was such a withdrawal or waiver, and if so, precisely what notes and memoranda the government is entitled to retain and use at trial,

and which notes and memoranda are protected by the JDA that was in existence.

A JDA without the right of prospective withdrawal would be void, if only because it would prevent one party to the JDA determining, as JPMC did in this case, that its own interests required it to cooperate with the government, rather than cooperate exclusively with its employees and their counsel. A participant in a JDA may also decide that it wants to "go it alone" and that doing so outweighs the benefits of continuing in the JDA. One party may decide that he, she or it wants to plead guilty to the charges that appear inevitable and that continuance in the JDA would deprive that party of the benefits which would come from negotiating an early plea agreement with the government.

As the Court indicated at the hearing, there are elements of withdrawal, modification and waiver involved in applying the legal principles to the facts.

### A. *Waiver*

■ As to the issue of waiver of the attorney-client privilege, there is no waiver of the individual privilege between LeCroy and his counsel, and Snell and his counsel. The only issue of waiver relates to certain protections of the JDA. The leading case in the Third Circuit on waiver of privilege is *Westinghouse v. Republic of the Philippines,* 951 F.2d 1414, 1423 (3d Cir.1991), holding that voluntary disclosure to a third party of purportedly privileged communications has long been considered inconsistent with the privilege. It is well settled that when a party voluntarily discloses privileged communications to a third party,

---

7. In an analogous situation, the Eleventh Circuit recently addressed the effect of a joint defense agreement in the criminal context, where one defendant cooperated with the government after the joint defense agreement had been entered into. In that case, the court held that when communications are made by one defendant to another defendant's attorney, "such communications do not get the benefit of the attorney-client privilege in the event that the co-defendant decides to testify on behalf of the government ..." *United States v. Almeida,* 341 F.3d 1318, 1326 (11th Cir.2003).

the privilege is waived. *Id.* at 1424. Similarly, when a party discloses a portion of otherwise privileged material but withholds the remainder, the privilege is waived only as to those communications actually disclosed, unless a partial waiver would be unfair to the party's adversary. *Id.* at 1426. Disclosure alone, without intent, may constitute waiver of the attorney-client privilege. *Id.* at 1427. The *Westinghouse* court indicated that "under traditional waiver doctrine a voluntary disclosure ... to a third party waives the attorney-client privilege even if the third party agrees not to disclose the communications to anyone else." *Id.* (*citing United States v. Rockwell International,* 897 F.2d 1255, 1265 (3d Cir.1990)) ("The attorney-client privilege does not apply to communications that are intended to be disclosed to third parties or that in fact are so disclosed.").

Defendants rely on *In re Grand Jury Subpoenas (89–3 and 89–4),* 902 F.2d 244, 248 (4th Cir.1990), for the proposition that the joint defense privilege cannot be waived without the consent of all the parties to the joint defense agreement. That case involved a dispute between a parent company and its wholly owned subsidiary—both of whom had been summoned before a grand jury—regarding the production of records. The Fourth Circuit held that the subsidiary could not unilaterally waive a joint defense privilege, and that the joint defense privilege may attach irrespective of whether an action is criminal or civil, and regardless of whether an action is ongoing or contemplated. *Id.* at 249.

The First Circuit recently made the following observation: "[T]he existence of a joint defense agreement does not increase the number of parties whose consent is needed to waive the attorney-client privilege; it merely prevents disclosure of a communication made in the course of preparing a joint defense by the third party to whom it was made." *Nameless Lawyer,* 274 F.3d at 572–73.

Applying these waiver principles to the present case, the Court finds that LeCroy and Snell waived some protections of the JDA by proceeding with the interviews with JPMC counsel in January 2004 and March 2004. Specifically, they voluntarily and knowingly waived the protection of the JDA to the extent that JPMC would be allowed to turn over the notes of those interviews to the government.

**B.  *Withdrawal***

Concerning the theory of withdrawal, neither the Court nor counsel have been able to find a case in which a court has specifically articulated a theory of withdrawal from a JDA. However, as the "template" agreement that Recker and Dodds had entered into in a prior case demonstrates, it is clearly contemplated by the parties to a JDA that one party could withdraw prospectively. Similarly, as the Court has noted above, any prohibition on withdrawal would be decidedly contrary to the public interest. There are some cases where courts have discussed the necessity of one party being able to withdraw from a JDA on a prospective basis.

In *United States v. Stepney,* 246 F.Supp.2d 1069, 1086 (N.D.Cal.2003), the court required that each joint defense agreement entered into by the defendants "must explicitly allow withdrawal upon notice to the other defendants." The court in *Stepney* elaborated on the risks inherent in a joint defense arrangement and emphasized that the protections afforded therein are not identical to the protections generally enjoyed under the attorney-client privilege:

Although a limitation on confidentiality between a defendant and his own attorney would pose a severe threat to the true attorney-client relationship, making each defendant somewhat more guarded about the disclosures he makes to the joint defense effort does not significantly intrude on the function of joint defense agreements.... Co-defendants may eliminate inconsistent defenses without the same degree of disclosure that would be required for an attorney to adequately represent her client.

*Id.*

In *United States v. Salvagno*, 306 F.Supp.2d 258 (N.D.N.Y.2004), a co-defendant agreed to cooperate with the government subsequent to entering into a JDA with another co-defendant. The JDA expressly permitted withdrawal and the court allowed the withdrawing defendant to disclose only "information he learned prior to the beginning or independent of the joint defense effort." *Id.* at 273. The court further relied on the averments by counsel for the withdrawing defendant that "he and the government took affirmative steps to ensure that information provided to the government ... did not violate the joint defense arrangement." *Id.* at 274.

### C. *Modification*

As to modification, there can be no dispute that parties to an agreement have the right to modify it. While one party to a contract cannot modify its terms without the assent of the other parties, the fact of agreement as to a modification may be implied from a course of conduct in accordance with its existence. 17A C.J.S. Contracts § 410. *See also International Business Lists, Inc. v. AT & T*, 147 F.3d 636, 641 (7th Cir.1998) ("A contract is validly modified if the party which did not propose the changes is shown to acquiesce in the

modification through a course of conduct consistent with acceptance.").

### D. *Analysis*

■ Although it may seem incongruous to discuss contractual modification principles in the context of a grand jury investigation, the theory of modification seems most analogous to the present situation. However, the Court also finds partial withdrawal by JPMC and a partial waiver by LeCroy and Snell. The Court is not obliged to shoehorn its decision into any particular single legal doctrine, but rather, to pragmatically apply the law to the facts and make a decision as to what evidence may be used by the government at the trial.

It is also important to note that although the Court finds that there was a significant modification of the JDA as of January 2004, the JDA nonetheless continued in existence, as modified, throughout the balance of the investigation and indeed continues in existence today, during the pretrial preparation stages.

In finding that JPMC did partially withdraw from the JDA prior to its January meetings with LeCroy and Snell, the Court is not being critical of JPMC, its counsel, or counsel for LeCroy and Snell. All counsel are skilled advocates with outstanding reputations in this Court. However, JPMC had determined for its own good and sufficient reasons—one of which is the fact that it is a highly regulated financial institution, and another may have been that it realized it may have been a victim of a fraudulent scheme—that it would, if the government "pushed," turn over the notes and memoranda of its meetings with LeCroy and Snell. JPMC thought it had the right to do so because LeCroy and Snell had their own counsel, and thus their meetings with JPMC counsel were not covered by their own personal

attorney-client privilege.[8]  However, the Court finds that JPMC counsel was mistaken in this belief, because having joined the JDA, JPMC was bound by it until and unless it withdrew.  Similarly, counsel for LeCroy and Snell strongly assert that JPMC could not turn over the notes and memoranda because of the JDA, and their expressions of this belief to JPMC counsel in January 2004 were credible and good advocacy, but not binding on this Court as a matter of law.

The Court believes that the most important facts on this issue relate to the discussions which Dodds had with Recker and Suddath *prior* to the January meetings in which Dodds explained to them that JPMC was retaining the right to turn over the notes of the interviews.  Also significant is the fact that Recker and Suddath clearly made JPMC's intent known to their clients, LeCroy and Snell, respectively.  With these facts, there is no dispute that LeCroy and Snell, and their counsel, were thoroughly advised of JPMC's intent and nonetheless decided to proceed with the January 2004 interviews with JPMC counsel.  LeCroy and Snell had the option, knowing in advance that these notes may be turned over to the government by JPMC counsel pursuant to the grand jury subpoena, to decline to be interviewed by JPMC counsel.  What would have been the risks and detriments of having done so?  The Court does not know and does not believe the answer to that question is determinative.  There are risks for every decision in a grand jury investigation, but

---

**8.**  The government likewise asserted that the interviews which JPMC counsel had with Snell and LeCroy were in the latter's capacity as corporate employees to a corporate counsel and thus JPMC had the unilateral right to waive its privilege.  The government cites *Bevill* in support.  In *Bevill*, two corporate officers objected to a district court order requiring disclosure of substantive communications with corporate counsel.  Both the officers and the two corporations involved were the subjects of criminal investigations.  The officers asserted that their communications were protected by the attorney-client privilege, but the district court disagreed, finding that the corporation had effectively waived the privilege.  The Third Circuit affirmed the holding of the district court, finding that the communications were made in their roles as corporate officials:

> [The officers] contend that because their personal legal problems were inextricably intertwined with those of the corporation, disclosure of discussions of corporate matters would eviscerate their personal privileges. . . . The appellants' argument, however, does not pay sufficient attention to the fact that under existing law, any privilege that exists as to a corporate officer's role and functions within a corporation belongs to the corporation, not the officer . . . Because a corporation can act only through its

agents, a corporation's privilege consists of communications by corporate officials about corporate matters and their actions in the corporation.  A corporate official thus may not prevent a corporation from waiving its privilege arising from discussions with corporate counsel about corporate matters.

*Bevill*, 805 F.2d at 124–25 (citing *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 349, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985)).  As noted above, the Court in *Bevill* held that no JDA existed, and thus the holding of *Bevill* does not apply in a case in which a JDA exists, as it did exist in the present case.  The Court rejects the understanding of JPMC and the advocacy of the government, because it is tantamount to negating the ability of an individual and a corporation, and each of their counsel, to enter into any JDA, if the corporate counsel can nonetheless unilaterally waive the corporate privilege any time the individual corporate employee speaks to the corporate counsel.  In this regard, see *U.S. v. Stepney*, 246 F.Supp.2d 1069 (N.D.Cal.2003), holding "the joint defense privilege was adopted as an exception to [the general] waiver rule, under which communications between a client and his own lawyer remain protected by the attorney-client privilege when disclosed to co-defendants or their counsel for purposes of a common defense."

the right of the grand jury to get the facts, and the right of JPMC, as a recipient of a grand jury subpoena, to decide to cooperate with the grand jury, are paramount.

There were good and abundant reasons why LeCroy and Snell, with the advice of their counsel, rationally, intelligently and knowingly decided to allow JPMC and its counsel to interview them, knowing that the notes of the interviews may be turned over to the government, but also knowing the JDA would continue, as modified. Under the JDA, the parties could continue to share information, documents, and access to witnesses without fear that any party continuing with the JDA would divulge that information. The only change in the terms of the JDA was that the notes of the interviews of LeCroy and Snell by JPMC could be turned over to the government. Assuming LeCroy and Snell were telling JPMC counsel the truth, their counsel wisely advised them to proceed with the interview even though the notes may be turned over to the government. This may have been the best possible strategy to avoid indictment. This Court intends to uphold the JDA to the extent that it was not modified. However, it is clear that JPMC initiated a modification of the JDA, or a partial withdrawal from it, and that LeCroy and Snell, with their counsel's advice, by agreeing to be interviewed by JPMC's counsel, and knowing that the notes and memoranda of such interviews may be turned over to the government, knowingly and intelligently agreed to the modification and thus waived the protections of the JDA as to those notes and memoranda on a prospective basis.

The provisions in the prior 2000 written agreement between Recker and Dodds regarding withdrawal were quoted above because it is clear to this Court that, notwithstanding and not necessarily inconsistent with the terms of the JDA—and the un-

derstanding of the lawyers who entered into it—there was indisputably, in January 2004, a partial withdrawal, or a modification, or a partial waiver by LeCroy and Snell, of the protections of the JDA to the extent that JPMC could turn over the notes of its counsel's interviews with LeCroy and Snell to the grand jury pursuant to the grand jury subpoena.

Modification took place by JPMC insisting that it would have to have the right to turn over the notes of its interviews of LeCroy and Snell to the government pursuant to the grand jury subpoena. By Dodds communicating this to counsel for LeCroy and Snell prior to the interviews, and counsel repeating this to their clients, and all parties proceeding with the interviews, there was an acknowledgment by all parties that the JDA had been modified to allow JPMC to produce the notes to the government. Notwithstanding Recker's and Suddath's dispute with Dodds as to whether JPMC had the right to do this, by the conduct of LeCroy and Snell (with their counsel's advice) of going to New York and submitting themselves to interviews with the knowledge that the notes of the interviews may be turned over to the government, the Court finds that this constituted a modification by their explicit conduct, done on a knowing and voluntary basis. LeCroy and Snell were not obliged to submit to the JPMC interviews. They could have refused to do so; what the consequences of their refusal may have been are undetermined but irrelevant.

The Court has also found, as to the March 2004 interviews, that although they were taken without advance knowledge of their counsel, LeCroy and Snell were business executives and were represented by very competent counsel. They already knew that there was a chance the notes of the January 2004 interviews would be turned over to the grand jury and by

nonetheless going ahead with the interviews in March 2004, their prior knowing waiver of the protection of the JDA against JPMC turning over the notes of its counsel during that interview continued.

A key ingredient in the Court's analysis is the public policy factor that the investigating grand jury receive any and all information that a subpoenaed party is willing to provide. The institution of the grand jury "in our Constitution as the sole method for proffering charges in serious criminal cases shows the high place it held as an instrument of justice." *Costello v. U.S.*, 350 U.S. 359, 362, 76 S.Ct. 406, 100 L.Ed. 397 (1956). The right to information is critical to the functioning of a grand jury, and "[b]ecause its task is to inquire into the existence of possible criminal conduct and to return only· well founded indictments, its investigative powers are necessarily broad." *Branzburg v. Hayes*, 408 U.S. 665, 688, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). As noted in *Branzburg*, although the powers of the grand jury are subject to certain limitations, the longstanding principle that "the public ... has a right to every man's evidence," except for those persons protected by a constitutional, common law, or statutory privilege, is particularly applicable to grand jury proceedings. 408 U.S. at 688, 92 S.Ct. 2686 (citing *United States v. Bryan*, 339 U.S. at 331, 70 S.Ct. 724; *Blackmer v. United States*, 284 U.S. 421, 438, 52 S.Ct. 252, 76 L.Ed. 375 (1932)).

> The grand jury may compel the production of evidence or the testimony of witnesses as it considers appropriate, and its operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials. "It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime."

*United States v. Calandra*, 414 U.S. 338, 349–50, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (quoting *Blair v. United States*, 250 U.S. 273, 282, 39 S.Ct. 468, 63 L.Ed. 979 (1919)). *See also United States v. Nixon*, 418 U.S. 683, 707–713, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

### V. Conclusion

The facts of this case demonstrate that although entering into a JDA is often, indeed generally, beneficial to its participants, like skating on thin ice, dangers lurk below the surface. When JPMC insisted on its right of turning over the notes of its interviews with Snell and LeCroy to the government, Snell and LeCroy had the option to reject JPMC's terms and refuse to submit to the interviews. By proceeding the way they did, LeCroy and Snell waived the protections they had under the existing JDA and, by their conduct, agreed to a modification of the JDA. For this Court to refuse the government use of the interview notes which JPMC turned over to the grand jury would amount to judicial suppression of evidence that the recipient of a grand jury subpoena legitimately turned over to the grand jury.

This Court believes that such a holding would not only be contrary to the application of settled principles of JDA law to the facts of this case, but also would result in LeCroy and Snell evading responsibility for their knowing and voluntary decisions to continue with the JDA under the modified terms as proposed by JPMC and agreed to by their own conduct.

For these reasons, the Court entered the Order protecting the interview notes while the JDA existed, and refused to pro-

tect the interview notes under the modification of the JDA proposed by JPMC and accepted by the conduct of LeCroy and Snell.

ORDER

AND NOW, this 10th day of January, 2005, it is hereby ORDERED as follows:

1. The Motion Of Defendants Anthony C. Snell And Charles LeCroy For Permission to File Motion for Reconsideration Of, And/Or To Correct, Memorandum Opinion Of December 17, 2004 (Doc. No. 319), is GRANTED.

2. The Motion Of Defendants Anthony C. Snell And Charles LeCroy For Reconsideration Of Memorandum Opinion Of December 17, 2004 (Doc. No. 320), which is unopposed by the government, is GRANTED. The sentence on page 2 that reads "[f]ollowing return of the indictment, LeCroy and Snell asserted claims of privilege with respect to notes and memoranda of interviews created by counsel for JPMC" is hereby amended to read "[b]oth before and after return of the indictment, LeCroy and Snell asserted claims of privilege with respect to notes and memoranda of interviews created by counsel for JPMC."